IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION

|  |  |  |
|---|---|---|
| L. CRAIG KENDRICK, <br> ROBERT and JOHNNA DYAS, <br> DONALD and SUZANNE WILSON, <br> JASON and DIANNA YOUNG, <br> JOHN NICHOLAS, <br> MARTHA YUNKER, and <br> KARLA MCCULLOUGH, <br><br> Plaintiffs, <br><br> v. <br><br> STATE FARM FIRE AND CASUALTY <br> INSURANCE CO., <br> STATE FARM AUTO INSURANCE CO., <br> NATIONWIDE MUTUAL INSURANCE <br> CO., <br> OHIO CASUALTY INSURANCE CO., <br> WEST AMERICAN INSURANCE CO., <br> STANDARD FIRE INSURANCE CO., <br> TRAVELERS INSURANCE CO., and <br> AMERICAN INTERNATIONAL SOUTH <br> INSURANCE CO., <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Judge David L. Bunning <br> Civil Action No.: 06-CV-141 |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT
OF THEIR MOTION FOR CLASS CERTIFICATION**

**TABLE OF CONTENTS**

I.      Introduction ...................................................................................2

II.     Argument.......................................................................................4

    A.      The Proposed Class Is Ascertainable ............................................4

            1.      The Class Definition is Proper Since it Permits Identification
                    of Class Members With Reference to Objective Criteria ...............5
            2.      Identifying Members of the Proposed Class is Administratively
                    Feasible .........................................................................12
                    a.      The Geocoding Software Can be Used To Identify
                            Persons Who Were Charged Excess LGPT………………17

    B.      Each of the Proposed Classes Satisfies the Requirements of Rule 23(a)...21

            1.      Numerosity is Satisfied By the Reasonable Estimate of Class
                    Sizes Generated by Plaintiffs....................................................21
            2.      Commonality is Satisfied As Core Questions of Law and Fact
                    Can Be Established on a Class-Wide Basis ....................................24
            3.      Typicality is Satisfied as the Claims of the Class
                    Representatives and the Class Members are Premised on
                    Identical Theories...................................................................27
            4.      Adequacy is Satisfied as the Record Plainly Demonstrates that
                    the Class Representatives and their Counsel have Vigorously
                    Prosecuted this Class Action without Conflict ...............................31
                    a.      The Class Representatives Have and Will Continue to
                            Vigorously Prosecute their Class' Claims ………………32
                    (1)     Jason and Diana Young are Adequate Representatives of the
                            Nationwide Mutual Insurance Class ...............................32
                    (2)     Gary and Susan Wilson and Robert and Johnna Dyas are
                            Adequate Representatives of the State Farm Classes .....34
                    (3)     Craig Kendrick is an Adequate Representative of the
                            Ohio Casualty Class.........................................................36
                    (4)     John Nicholas is an Adequate Representative of the
                            West American Class........................................................36
                    (5)     Karla McCullough is an Adequate Representative of
                            the American International South Class .........................38
                    b.      The Class Representatives' Decision to Pursue
                            Certification of Certain Claims and Not Others is in
                            Best Interest of the Classes .............................................39
                    c.      Plaintiffs Have Retained Counsel Experienced in
                            Class Action Litigation ..................................................41

    C.      Each of the Classes Satisfy the Requirements of Rule 23(b)....................43

            1.      Common Questions of Law or Fact Predominate Over

Individual Questions ..................................................43

    a.   Defendants' Liability Can Be Established on a
Class-Wide Basis ..................................................45

        (1)   Illegal Dealings in Premiums............................46

        (2)   Conversion ......................................................47

        (3)   Negligent Servicing .......................................49

        (4)   Declaration of Rights .......................................50

    b.   Individual Issues as to Causation and Related
Defenses Will Not Predominate......................................50

    2.   The Instant Class Action is the Superior Form of Adjucating
the Claims of Plaintiffs and Class Members..................................53

    a.   Plaintiffs Are Not Required to Exhaust Administrative
Remedies, and Administrative Remedies Would Not
Adequately Address Plaintiffs's Claims ........................54

    b.   Alternative Methods of Addressing Plaintiff's Injuries
Do not Offer the Efficiencies, or the Security, of Class
Treatment ..................................................57

III.   Conclusion ..........................................................58

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Adams v. Federal Materials Co., Inc.*, 2006 WL 3772065 (W.D. Ky. Dec. 19, 2006).....31

*Adashunas v. Negley,* 626 F.2d 600 (7th Cir. 1980) ........................................................13

*Alkire v. Irving*, 330 F.3d 802 (6th Cir. 2003) ................................................................23

*Bacon v. Honda of Am. Mfg.*, 370 F.3d 565 (6th Cir. 2004).......................................22, 30

*Ball v. Union Carbide Corp.,* 385 F.3d 713 (6th Cir.2004)........................................29, 30

*Ballan v. Upjohn Co.*, 159 F.R.D. 473 (W.D. Mich. 1994)...............................................43

*Basco v. Wal-Mart Stores*, 216 F.Supp. 2d 592 (E.D. La. 2002)......................................45

*Beattie v. Century Tel, Inc.*, 511 F.3d 554 (6th Cir. 2007) ...................................28, 47, 51

*Bentley v. Honeywell Int'l, Inc.*, 223 F.R.D. 471 (S.D. Ohio 2004) ...........................24, 27

*Bittinger v. Tecumseh Prods Co.*, 123 F.3d 877 (6th Cir. 1997) ................................51, 53

*Brashear v. Perry County,* No.6:06-143, 2007 WL 1434876 (E.D. Ky. May 14, 2007) 5, 7

*Brockman v. Barton Brands, Ltd.*, 2007 WL 4162920 (W.D. Ky. Nov. 21, 2007)...........23

*Carnegie v. Mutual Sav. Life Ins. Co.,* 2002 WL 32989594 (N.D. Ala. Nov. 1, 2002) ....40

*Cimino v. Raymark Industries, Inc.* 151 F.3d 297 (5th Cir. 1998) ...................................11

*Chesner v. Stewart Title Guar. Co.*, 2008 WL 553773 (N.D. Ohio Jan 23, 2008)..9, 45, 47

*Coffin v. Bowater, Inc.*, 228 F.R.D. 397 (D. Me. 2005) ...................................................51

*Cohen v. Chi. Title Ins. Co.,* 242 F.R.D. 295 (E.D. Pa. 2007)....................................15, 53

*Collins v. Olin Corp.*, 248 F.R.D. 95 (D.Conn. 2008)......................................................52

*Castano v. American Tobacco Co.,* 84 F.3d 734, (5th Cir. 1996) ....................................43

*Crosby v. Social Sec. Admin. of U.S.*, 796 F.2d 576 (1st Cir. 1986) ................................13

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006)............................................12

*Doran v. Missouri Dept. of Soc. Serv.*, 2008 WL 1990794 (W.D. Mo. May 2, 2008)........9

*Dubin v. Sec. Union Title Ins. Co.*, 162 Ohio App. 3d 97 (Ohio App. 8 Dist. 2005) ........45

*Dunnigan v. Metro. Life Ins. Co.,* 214 F.R.D. 125 (S.D.N.Y. 2003)...........................19, 20

*Eversole v. EMC Mortgage Corp.,* No. 05-124-KSF, 2007 WL 1558512
(E.D. Ky. May 29, 2007) ........................................................................................5, 7, 22

*Feinstein v. Firestone Tire and Rubber Co.*, 535 F. Supp. 595 (S.D.N.Y. 1982) .......40, 41

*Fisher v. Va. Elec. & Power Co.,* 217 F.R.D. 201 (E.D.Va, 2003) ..............................9, 14

*Gevedon v. Purdue Pharma*, 212 F.R.D. 333 (E.D. Ky. 2002))..................................21, 23

*Golden v. City of Columbus*, 404 F.3d 950 (6th Cir. 2005)................................................23

*I.A.M. Nat'l Pension Fund, Ben. Plan C, v. Schulze Tool and Die Co., Inc.,*
564 F. Supp. 1285 (7th Cir. 1983) .............................................................................54, 55

*Iliadis v. Wal Mart Stores, Inc.*, 904 A.2d 736 (N.J. Super. 2006)....................................45

*Iliadis v. Wal-Mart Stores, Inc.*, 191 N.J. 88 (2007)........................................................45

*In re American Medical Sys.*, 75 F.3d 1069 (6th Cir. 1996)...................................... passim

*In re the Matter of Bridgestone/ Firestone, Inc.*, 288 F.3d 1012 (7th Cir. 2002)..............54

*In re Coordinated Title Insurance Cases,* 784 N.Y.S.2d 919 (2004) ....................... passim

*In re DSC, Limited*, 486 F.3d 940 (6th Cir. 2007) ...........................................................33

*In re Paxil Litig.,* 212 F.R.D. 539 (C.D. Cal. 2003) .........................................................12

*In re Visa Check/ MasterMoney Anti. Litig.*, 280 F.3d 124 (2d Cir. 2001) ......................51

*Jack Faucett Ass'n. Inc. v. AT&T Co.,* 1983 WL 4601 (D.D.C. Mar. 18, 1983).............. 15

*Joseph Goldberg Iron Co. v. Cincinnati Iron & Steel Co.*, 154 S.W. 374 (Ky. 1913)......48

*Kamen v. Kemper Financial Services, Inc.*, 908 F.2d 1338 (7th Cir. 1990).....................34

*Kirkman v. N.C.R.R.*, 220 F.R.D. 49 (M.D.N.C. 2004) ....................................................14

*Kline v. Security Guards, Inc.*, 196 F.R.D. 261 (E.D. Pa. 2000) .......................................13

*Kurczi v. Eli Lilly & Company,* 113 F.3d 1426 (6th Cir. 1997)...................................29, 30

*Kurihara v. Best Buy Co., Inc.*, No. C06-01884, 2007 WL 2501698
(N.D. Cal. Aug. 30, 2007)..................................................................55

*Ky. Ass'n of Counties All Lines Fund Trust v. McClendon*, 157 S.W. 3d 626
(Ky. 2005)............................................................................................47

*Lazar v Hertz Corp,* 143 Cal. App. 3d 128 (1983) ...........................15

*Lewis v. B&R Corporation*, 56 S.W. 3d 432 (Ky. App. Ct. 2001) ....................................49

*Liles v American Corrective Counseling Services, Inc.,* 231 F.R.D. 565,
(S.D. Iowa 2005)................................................................................14

*Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017 (6th Cir. 1979) ............................48

*McDaniel v. North American Indem., N.V.,* No. IP-02-C-0422, 2003 WL 260704
(S.D. Ind. Jan. 27, 2003) ..................................................................38

*Microsoft Corp. v. Manning*, 914 S.W.2d 602 (Tex. App. 1995)......................................40

*Mitchell-Tracey v. United Gen. Title Ins. Co.,* 237 F.R.D. 551 (D. Md. 2006)......... passim

*Mitchell v. Chicago Title Ins. Co.,* No. CT-02-017299, 2003 WL 23786983
(Minn. Dist. Ct., Dec. 22, 2003) .................................................45, 53

*Montgomery v. Rumsfeld*, 572 F.2d 250 (9th Cir. 1978) ..................................................55

*Nudell v. The Burlington Northern and Santa Fe Railway Co.*, 2002 U.S. Dist.
LEXIS 12770 (D.N.D. July 11, 2002) ......................................12, 14

*Ostrof v. State Farm Mut. Auto. Ins. Co.*, 200 F.R.D. 521 (D. Md. 2001) .......................56

*Paine, Webber, Jackson & Curtis, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
587 F. Supp. 1112 (D. Del. 1984)......................................................11

*Patillo v. Schlesinger*, 625 F.2d 262 (9th Cir. 1980) ...............................................54, 56

*Pearl v. Allied Corporation*, 102 F.R.D. 921 (E.D. Pa. 1984).....................................40, 41

*Randleman v. Fidelity Nat'l Title Ins. Co.*, No. 3:06-cv-7049 2008 WL 2323771
 (N.D. Ohio, June 4, 2008).......................................................... passim

*Rankin v. Rots*, 220 F.R.D. 511 (E.D. Mich. 2004) ...................................................27, 29

*Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293 (7th Cir. 1995) ................................................11

*Rodolico v. Unisys Corp.*, 199 F.R.D. 468 (E.D.N.Y. 2001)............................................52

*Senter v. GMC*, 532 F.2d 511 (6th Cir. 1976)........................................................22, 29, 31

*Slapikas v. First American Title Insurance Co.*, 2008 WL 793919
(W.D. Pa. March 24, 2008)........................................................................................54

*Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32 (1st Cir. 2003) ...................52

*Smith v. First Century Bank*, No. 3:04-cv-591, 2005 WL 1840251
(E.D. Tenn. August 3, 2005)......................................................................................23

*Sprague v. GMC*, 133 F.3d 388 (6th Cir. 1998) ...........................................................24, 30

*State ex rel. Coca-Cola v. Nixon*, 249 S.W.3d 855 (Mo. 2008) ..................................19, 20

*State Auto Mut. Ins. Co. v. Chrysler Credit Corp.*, 792 S.W. 2d 626 (Ky. App. 1990)47, 48

*Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188 (6th Cir. 1988).........................24, 41, 45

*Stout v. J.D. Byrider*, 228 F.3d at 717 (6th Cir. 2000).......................................................30

*Sullivan v. Chase Inv. Serv. Inc.*, 79 F.R.D. 246 (N.D. Cal. 1978)............................39, 40

*Susman v. Lincoln American Corp.,* 561 F.2d 86 (7th Cir. 1977) ..............................37, 38

*Turner v. Grant County Detention Center*, No. 05-148-DLB, 2008 WL 821895
(E.D. Ky. Mar. 26, 2008)....................................................................................20, 22, 31

*Twigg v. Sears and Roebuck & Co.*, 153 F. 3d 1222 (11th Cir. 1998) ..............................40

*Urban v. Lansing's Adm'r*, 239 Ky. 218 (1931)..................................................................48

*Van Jackson v. Check 'N Go of Illinois, Inc.,* 193 F.R.D. 544 (N.D. Ill. 2000) ...............53

*Waste Mgmt. Holdings, Inc., v. Mowbray,* 208 F.3d 288 (1st Cir. 2000).........................51

*Weinberg v. Hertz Corp,* 116 A.D.2d 1 (1st Dep't 1986) ...................................................15

*Zachary v. Texaco Exploration*, 185 F.R.D. 230 (W.D. Tex. 1999) .................................40

## I.    INTRODUCTION

This case seeks to do no more than return to the Plaintiffs and the Members of the Classes they seek to represent the taxes on their insurance premiums wrongfully collected by each of the Defendants, and to ensure that proper measures are implemented by each Defendant to reasonably protect against such errors in the future.  A class action is the only way either result will be meaningfully obtained.   Each Defendant has denied that it is legally obligated to return the overpayments to its insureds, or to even inquire as to whether such instances of overcharge have occurred, and each has filed a responsive brief advancing various (and largely repetitive) arguments why the class action procedure is unworkable here and how the Plaintiffs otherwise fail to prove that the requirements for class certification have been met.  Absent class certification, Defendants will reap a financial windfall by retaining the taxes they were not legally required to collect and the attendant collection fees they added to their customer's bills.

Nevertheless, as Plaintiffs' memorandum in support of their Motion for Class Certification has shown, and this reply brief will re-enforce, this case is well-suited for class treatment and Plaintiffs' motion for class certification should be granted.[1]  As the Court recognized much earlier in this litigation, "[t]he depth and breadth of what Plaintiffs seek to accomplish here is substantial."[2]  Yet it can be done.

The first step is to identify the members of the class for purposes of class notice.  The Defendants contend this cannot be done.  They are wrong.  As the proposed class definition

---

[1] This reply brief responds to the various opposition memoranda filed by Defendants Nationwide Mutual ("Nationwide"), Ohio Casualty Insurance Co. ("Ohio Casualty"), West American Insurance Co. ("West American"), American International South Insurance Co. ("American International"); State Farm Fire and Casualty Co. and State Farm Auto Insurance Co. ("State Farm"); Standard Fire Insurance Co. ("Standard Fire"); and Travelers Property Casualty ("Travelers").  As to Defendant Travelers, Plaintiffs note that they inadvertently refer to "Travelers Insurance Co." instead of the proper Defendant, Travelers Property Casualty, in the class definition proposed in the opening memorandum in support of their motion for class certification.

[2] Memorandum Opinion and Order, Doc. 131, filed Mar. 31, 2007 ("Memorandum Op.").

relies exclusively on objective criteria, the class is identifiable.  Readily available geo-coding software, supplemented by manual verification, will identify an overwhelmingly high percentage of class members.  The class action jurisprudence requires nothing more.

The remaining class members will be identified after class notice has been disseminated. While this task could be labor intensive and potentially costly, those are not reasons to deny class certification.  It would make no sense to allow large insurance companies with hundreds of thousands of insureds to escape liability merely because of the size of their operations, though that is essentially the argument Defendants are making here.[3]

During the merits phase of this litigation, Plaintiffs will file motions for partial summary judgment.  Plaintiffs anticipate that the first of these motions will be for summary judgment under the Illegal Dealings in Premiums statute, as this motion will not require significant discovery on the merits.  This motion will also seek a declaration that collection fees cannot be charged *in addition to* the LGPT.  Plaintiffs anticipate that the second motion will be for summary judgment under the conversion count, to be filed after discovery is obtained from each Defendant relating to the collection of premium taxes from its insureds and payments made to the local governments. Plaintiffs do not anticipate filing a summary judgment motion based on negligence as this claim relies on proof (some of which is identified herein) that each Defendant failed to take the measures necessary to properly assign the location of the risk, a genuine issue of material fact that is likely to remain in dispute.[4]

---

[3] Instead of allowing Defendants to aggregate their numbers, thereby inflating the magnitude of the task at hand and hiding the relatively small Defendants behind Defendant State Farm, which is at least 7 and as much as 100 times larger than the other Defendants, the Court should evaluate each Defendant separately.  To that end, the Plaintiffs shall move to sever all but Defendant Standard Fire Insurance from this litigation so that each of the Plaintiffs can separately prosecute their claims against their respective insurer in separate actions.

[4] Plaintiffs have decided to seek certification of their claims sounding in Illegal Dealings in Premiums, Negligence, Conversion and a Declaration of Rights only.  Class Representatives are not only obligated to seek certification of claims which can be prosecuted on a class basis, they are equally obligated to refrain from seeking certification of claims that are unsuitable for class treatment.  *See, infra,* at 39-41.

Thus, this case can be resolved as a class action with the necessary investment of time and money that Plaintiffs and their counsel are prepared to make, with the cooperation of each Defendant during the merits phase, and with the involvement of the Court as is typical for complex litigation.  Plaintiffs' Motion for Class Certification should therefore be granted.

## II.   ARGUMENT

### A.   <u>The Proposed Class Is Ascertainable.</u>

As anticipated, Defendants have for the second time aimed their largest guns at the class definition, contending in a separate 23-page brief that the class definition requires a "merits-based" determination to identify class members and, in any event, identification of class membership is not administratively feasible.[5]   Defendants' first assault on the class definition came as a motion to strike. *See* Joint Motion of Certain Defendants to Strike Class Allegations, Aug. 22, 2007, Doc. 191.[6]  There, as here, Defendants argued that determining membership in the proposed class would impermissibly require a determination on the merits and that the proposed class definition is therefore not administratively feasible.  The Defendants argued there, as here, that the Court will have to make a determination on the "merits" to determine class membership.

---

[5] Joint Memorandum of Defendants Ohio Casualty Insurance Company, West American Insurance Company, State Farm Mutual Automobile Insurance Company, State Farm Fire and Casualty Company, American International South Insurance Company, and Nationwide Mutual Insurance Company In Opposition to Plaintiffs' Motion for Class Certification on the Basis of Uncertifiable Class Definition, Aug. 11, 2008 (Doc. 354-3).

[6] At that time,  Plaintiffs' proposed class was is defined as follows:

> All customers of the Defendants and customers of any other insurance company doing business in the Commonwealth of Kentucky who purchased an insurance policy and who were unlawfully charged local government premium taxes or collection fees for the period of time from January 2001 to the present and have not had their premiums returned to them by the date of the filing of the Complaint.

(Am. Comp. at ¶ 97) (June 16, 2006) (Doc. 1) (emphasis added).  The definition of the class plaintiffs are now seeking to certify removes the subjective language.

At oral argument the Defendants identified five questions which would have to be answered to determine if an insured was a class member:

> And the question that you're going to have to ask as to each person, just to figure out if they're in the class, is where do they live, what was the taxing rate, how much did they pay, was it too much, and did they pay a collection fee or not? Six [sic] questions times hundreds of thousands of people.

Status Conference Transcript, Dec. 12, 2007, at 15 ("Status Tr.").

There, as here, the Defendants argued that a determination made under what they conceded was "objective criteria," *Id.,* at 33, would be a determination "on the merits that they were charged tax they shouldn't have been." There, the Court rejected this argument:

> THE COURT: No, I haven't. I wouldn't have decided the merits of that. That's just the potential class.

*Id.,* at 34. As set forth in full below, the Court's initial instinct was correct and the class definition as now proposed does not require a merits determination and does not suffer from any deficiency. The same result should follow here.

With respect to administrative feasibility, the evidence before the Court shows that readily available geo-coding software is sufficiently robust to perform the task of identifying the class at this stage of the proceedings. Ultimately, it may well be necessary to conduct additional review of thousands or tens of thousands of files to determine class membership, but the courts have uniformly refused to deny class certification when the only obstacle to ascertaining class membership is time and expense.

### 1. The Class Definition is Proper Since it Permits Identification of Class Members With Reference to Objective Criteria.

The parties can agree on one thing – class definitions may *not* involve a determination on the merits to identify who is within the class. *Eversole v. EMC Mortgage Corp.*, No. 05-124-KSF, 2007 WL 1558512, at *15 (E.D. Ky. May 29, 2007); *Brashear v. Perry County,* No.6:06-

143, 2007 WL 1434876, at *2 (E.D. Ky. May 14, 2007).  The parties might even agree that a class definition is improper if it requires resolution of *disputed* elements of plaintiffs' claims simply to determine who is in the putative class.  But the parties nonetheless take opposing positions on the question of whether the definition at bar would require the Court to make a determination on the merits. The Defendants contend it will.  The evidence is to the contrary.

As set forth above, class membership can be ascertained by answering just five objective questions:

- where is the insured property located?
- what was the taxing rate?
- what rate did the insured pay?
- was the rate the insured pay greater than  the applicable rate?
- did the insured pay a collection fee?

Defendant American International South has reduced this formulae to just three criteria:

- where was the insured risk located?
- where was that location compared to local municipal boundaries in effect at the time the tax was charged?
- was the appropriate tax amount based on the forgoing lower than the amount charged.

American International South Memo., at 1.

One Defendant in the related the related *Nichols, et al., v. Progressive Direct, et al.*, No. 2:06-cv-00146-DLB case, reports having adopted a straight-forward procedure to initially assign insured risks to the correct jurisdiction, and correspondingly apply the correct tax rate— and that procedure contains many, if not all, of the very steps needed to ascertain class membership using each Defendant's existing data.  Defendant Kentucky Farm Bureau ("KFB"), one of the few Defendants to have adopted the use of geo-coding software at any stage of the premium calculation process, uses the software to identify the jurisdiction in which the insured risk appears to be located.  *See* Affidavit of Jeffrey L. Koch, Aug. 18, 2008, at ¶ 8, (Attached as Ex.

A to Memorandum of Kentucky Farm Bureau in Opposition to Plaintiffs' Motion for Class Certification, No. 2:06-cv-00146, Doc. 235).  The predicted jurisdiction generated by ISO's tax verification software is compared to the jurisdiction listed on the policy to determine whether they match. *Id.*  If the predicted tax jurisdiction and the tax jurisdiction listed on the policy do not match, KFB then takes additional steps to determine why the difference exists (primarily by having the local agent ascertain whether the jurisdiction listed on the policy is correct by contacting the local Property Valuation Administrator ("PVA") or by whatever other means may be necessary) so as to ensure the proper tax code, if any, is applied.  *Id.*  This process ultimately leads to an indisputable result— the proper tax code was applied or it was not or, stated differently, the insured paid the proper tax or he or she did not.  It is difficult to see how this objective inquiry into undisputable facts will generate *any* disputes for the Court to resolve, much less the millions of factual determinations the Defendants claim the definition will require.

In *Eversole*, by contrast, class membership required a determination as to whether the defendant EMC "failed to post or credit …timely mortgage payments , … *in accordance with the terms* of their mortgage loans." 2007 WL 1558512, at *15 (emphasis added).  The *Eversole* court believed it would be required to conduct a "mini-hearing on the merits" to determine whether EMC failed to post or credit any timely monthly payment "in accordance with the terms" of each plaintiff's note and mortgage, an issue clearly in dispute.[7] *Id.*  The other cases upon which Defendants rely are much the same. The proposed definition is *Brashear*, if certified, would have required the Court to determine whether a particular individual was subjected to *unconstitutional* prison conditions – "a somewhat subjective determination[ ]" – to identify class memberships. *Brashear,* 2007 WL 1434876, at *3.

---

[7] Indeed, one which was even identified as a common question of law among the class members. *Id.*

As demonstrated by the handling of this complex class action during disputed motions to dismiss, and multiple settlements presented for Court approval, this Court is well-equipped to evaluate the proposed class definition without help from a roster of law professors.  However, if the Court decides to take the opinions of the law professors into account, it should see that their opinions are of no value.  Instead the opinions of the law professors reveal Defendants' singular, albeit misplaced, insistence that the proposed class definition improperly requires a merits-based inquiry to determine membership.

Professor Redish, for example, bases his opinion on the original class definition by focusing on the word *unlawfully* and opines that the Court cannot make a determination of class membership "without first determining whether each and every class member has been *unlawfully* charged such a fee."  Expert Report of Professor Martin H. Redish on Behalf of Nationwide Mutual Insurance Co. Pursuant to F.R.C. P. 26(a)(2)(B), Aug. 11, 2008, ¶ 14 (Doc. 354, App. 1)   Professor Redish blindly holds to his opinion even in the face of the revised definition.

> But the mere change in wording does nothing to alter the problem: this Court would still need to determine, prior to a claimant's inclusion in the class, whether the local taxes paid were "not owed" or "at rates higher than permitted." Both inquiries would, of course, require this Court to make a legal determination, in the individual case, whether taxes were or were not owed, or whether the rate was higher than permitted. The change in wording thus represents no change in the nature of this Court's required inquiry into the substantive merits, because the way this Court would have determined, under the originally proposed definition, whether payment had been "unlawful" would have been by deciding whether the paid taxes had not been owed or were at a higher rate than permitted.

*Id.*, at ¶ 17.  Professor Redish's conclusion was hardly true before the definition was modified to remove the word "unlawfully," and is still hardly true.  The inquiry is entirely objective and will

8

not require a legal determination or any inquiry by the Court into the substantive merits of the claim.[8]

The opinions of Professors Klonoff and Mullenix are very much the same and unnecessarily cumulative.  Professor Klonoff likewise mistakenly assumes that the definition will require the Court to determine whether a particular putative class member was *unlawfully* charged taxes or fees before determining whether that person is in the class. Declaration of Robert Klonoff, May 14, 2008, ¶¶ 11, 19 (Doc. 354, App. 2).  Professor Mullenix, too, assumes class membership requires a determination of the merits of the claim:

> In order to determine who is in the class, the court would have to determine the ultimate liability issue in this litigation, which is whether the Defendants *illegally* imposed premium insurance taxes and fees on class members.

Declaration of Linda S. Mullenix, May 7, 2008, ¶ 57 (Doc. 354, App. 3)(emphasis added).  Even in her supplemental affidavit, Professor Mullenix acknowledges the change in the proposed definition but inexplicably maintains that the definition nonetheless requires the court to resolve "the two underlying merits issues, which are whether the class members were charged taxes which were owed or not owed, and whether the class members were charged taxes at rates higher than permitted."  Supplemental Declaration of Linda S. Mullenix, July 28, 2008, Aff., ¶ 6 (Doc. 354, App.3).   Yet, she does not and cannot explain why any hearings will be necessary to make completely objective determinations. *Fisher v. Virginia Electric and Power Co.,* 217 F.R.D. 201, 218 (E.D. Va. 2003) ("This inquiry is by nature individual and no doubt will be a significant one,

---

[8] Improper liability-based definitions may be corrected and approved.  *See, e.g., Chesner v. Stewart Title Guar. Co*., No. 1:06-cv-000476, 2008 WL 553773, at *4 (N.D. Ohio Jan 23, 2008*)* ("This defect is, however, rather easily cured by recasting the definition in terms of Plaintiffs' liability theory, and making class membership contingent instead on whether the objective facts that Plaintiffs believe trigger entitlement to the discount were present in the particular transaction." ); *see also Doran v. Missouri Dept. of Soc. Serv.,* No. 07-4158, 2008 WL 1990794, at *6 (W.D. Mo. May 2, 2008) (court altered class definition by replacing the phrase "monies improperly taken" with "monies taken"); *Chesner,* 2008 WL 553773, at *4 (court redefined improper liability-based definition where impossible to tell at class certification stage if any individual was entitled to a lower rate than was charged by making class membership contingent upon "whether the objective facts that Plaintiffs believe trigger entitlement to the discount were present in a particular transaction" ).

but it is certainly manageable and addressable through the application of purely objective criteria.").

The definition, however, is not improper merely because the factual predicate for class membership overlap with elements of the alleged causes of action. While it is true that each of Plaintiffs' cause of action requires proof that each class member was charged LGPT that was either not owed or was at a rate higher than permitted, it is not the *objective facts* of these charges which are in dispute, but other, largely subjective, elements of liability. Thus, for example, with respect to Count I (Kentucky's "Illegal Dealing in Premiums" statute) the issues in dispute will be the meaning of the term "willfully" and whether the premium tax is a "premium or charge for insurance." The objective facts determinative of an overcharge – *i.e.*, the physical location of a property, the jurisdictional tax boundaries, the applicable tax rate, and the rate applied – cannot seriously be said to be "in dispute" or are otherwise likely to need formal adjudication. And, as Defendants' concede, the conversion count will turn on whether Defendants *wrongfully* collected LGPT, not whether the tax was in fact paid.

Defendants' refusal to recognize the distinction between the *objective* facts which determine class membership and the *subjective* determinations which would help determine liability, carries over into their Seventh Amendment argument. Specifically, Defendants contend that the proposed definition would violate their Seventh Amendment right to have "one jury resolve all factual questions necessary to establish liability." This argument suffers from two flaws. First, it is unlikely that the determination of the objective facts of class membership will raise any disputed issues. A property is either located in a particular tax jurisdiction or it is not;

10

the tax rate applicable to that jurisdiction was either charged and paid, or it was not.  While these facts may need to be checked, they are not likely to be in dispute.[9]

Second, although, a district court cannot "divide issues between separate trials in such a way that *the same issue* is reexamined by different juries," *Matter of Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1303 (7th Cir. 1995) (emphasis added), the Seventh Amendment does not prohibit bifurcation of trials as long as the "the judge [does] not divide issues between separate trials in such a way that the same issue is reexamined by different juries."   *Cimino v. Raymark Industries, Inc.*, 151 F.3d 297, 321, n.50 (5th Cir. 1998)).  Thus, two juries *can* examine overlapping evidence, so long as they do not decide factual issues that are common to both trials and essential to the outcome.  *See Houseman v. U.S.  Aviation Underwriters*, 171 F.3d 1117, 1126 (7th Cir. 1999) *see also Paine, Webber, Jackson & Curtis, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 587 F. Supp. 1112, 1117 (D. Del. 1984) ("The prohibition is not against having two juries review the same evidence, but rather against having two juries decide the same essential issues.").  It follows that the Court can in fact make findings on any disputed issues concerning class membership, and allow a jury to decide any other factual disputed determinative of liability (i.e., whether the defendant acted "negligently"), without violating any Defendant's Seventh Amendment rights—particularly where, as here, the need for Court involvement in factual disputes will be virtually non-existent.[10]

In the final analysis, a class definition is proper if it defines who should receive notice.  A class which cannot be defined until the case is resolved on its merits is an impermissible "failsafe class," "meaning potential members are only bound by a favorable decision" while an

---

[9] In limited instances, an insured risk may be "located" on jurisdictional boundaries, but even then a determination of where the risk is "located" for taxing purposes has *already* been made by the local PVA.
[10] It is entirely likely that after class certification each Defendant's liability will be determined by summary judgment.

unfavorable decision on the merits "would be the same as a class membership decision and would come late enough to allow the to opt out of the class." *Nudell v. The Burlington Northern and Santa Fe Railway Co.*, No. A3-01-41, 2002 WL 1543725, at *2 (D.N.D. July 11, 2002). That is why, in a case like *In re Paxil Litig.,* 212 F.R.D. 539, 545 (C.D. Cal. 2003), where the class was defined as Paxil users who have suffered "severe" withdrawal symptoms, class membership could not be determined until individual trials had determined if the symptoms were "severe" – a subjective determination if ever there was one.

Here, conversely, the members of the class can be and will be determined prior to the merits stage with the assistance of geo-coding software and, as may be necessary, examination of individual files. As daunting, time-consuming and costly a task as this may be, it does not render the class definition improper, as discussed more fully below. [11]

### 2. Identifying Members of the Proposed Class is Administratively Feasible.

Although Defendants' attack on the proposed class definition fails to distinguish between *objective fact* inquiries and subjective determinations (presumably because a definition, like the one proposed, which is based on objective facts is not improper), Defendants finally come clean in their discussion of the administrative feasibility of identifying class members. Here, the Defendants no longer argue that the determination is subjective. *See* Joint Memorandum of Defendants Ohio Casualty Insurance Company, American West Insurance Company, State Farm

---

[11] Defendants' argument that the Court's approval of settlement classes with substantially similar class definitions has no bearing on the analysis here is incorrect. "Before certification is proper for any purpose--settlement, litigation, or otherwise--a court must ensure that the requirements of Rule 23(a) and (b) have been met." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 270 (2d Cir. 2006). "These requirements should not be watered down by virtue of the fact that the settlement is fair or equitable." *Id*. In the prior settlements in this litigation, the requirements for class certification, including ascertainability, were fully briefed and duly ruled upon by the Court. None of the non-settling Defendants objected to certification of these settlement classes.

Mutual Automobile Insurance Company, State Farm Fire and Casualty  Company, American International South Insurance Company, and Nationwide Mutual Insurance Company In Opposition to Plaintiffs' Motion for Class Certification on the Basis of Uncertifiable Class Definition, Aug. 11, 2008, at 11 (Doc. 354) ("Joint Memo.") ("avoidance of subjective criteria, though, is but *one* requirement for a proper class definition.") (emphasis in original).  Taking a new tact, the Defendants instead and alternatively contend that the Court would have to conduct millions of individual inquiries in order to identify class members and the class definition is improper for that reason.   For a variety of reasons, the Court should not cower in the face of this argument.

First, the suggestion that the Court will have to resolve *any* factual dispute concerning class membership or conduct any hearings is nothing but speculation.  The criteria for class membership are entirely objective and rely overwhelmingly on uncontroversial objective facts.  While conceding, as Plaintiffs must, that there may be limited circumstances where Court involvement may be warranted, it is impossible to understand why the Court would have to be called upon to resolve any great number of factual disputes, much less make millions of factual determinations.

Second, the cases upon which Defendants rely are inapposite.  This is not a case like *Crosby v. Social Sec. Admin. of U.S.*, 796 F.2d 576, 580 (1st Cir. 1986), where the court found that a class definition which hinged upon a determination of "unreasonable delay"  posed an "insurmountable difficulty" since "what is unreasonable must necessarily vary from claimant to claimant, " or *Adashunas v. Negley,* 626 F.2d 600, 603 (7th Cir. 1980), where the definition required the "gargantuan task" of identifying learning disabled children, which can only be done through a battery of testing of a period of years, or even *Kline v. Security Guards, Inc.*, 196

13

F.R.D. 261, 267, fn. 5 (E.D. Pa. 2000), where the proposed class "would have required an individual examination of each alleged class member to determine the issue of 'unlawful' surveillance" to determine class membership.[12]

Third, the case at bar does bear some resemblance to *Kirkman v. N.C.R.R.*, 220 F.R.D. 49 (M.D.N.C. 2004), but whereas the *Kirkman* court recoiled from the challenge of ascertaining potential class members through detailed title searches, many other courts did not cower when faced with significantly greater administration challenges, as we will discuss below.[13]  Instead, and as demonstrated more fully below, the Court should be guided by *Randleman v. Fidelity Nat'l Title Ins. Co.*, No. 3:06-cv-7049, -- F.R.D. --, 2008 WL 2323771 (N.D. Ohio, June 4, 2008), and the highly analogous line of title insurance discount rate class actions.  In those cases, as here, the defendants argued that identifying members of the class would be a "gargantuan task" which weighed heavily against certification:

> The defendants contend that the structure of the mortgage policy premium sales business, and industry methods of record keeping, mean that it would take years to search the policy-holder files to determine eligibility for the reduced rate. In order to even identify the members of the classes defined in plaintiffs' complaints, *the files of hundreds of thousands of loan policy transactions will have to be analyzed*, and the vast majority of these files are in the hands of title insurance sellers involved in agency relationships with the defendants. Further, defendants assert that even a thorough search of their records would not necessarily clarify which policy holders were entitled to, or did or did not receive the reduced rate.

---

[12] Defendants cite *Liles v. American Corrective Counseling Services, Inc.*, 231 F.R.D. 565, 571-72 (S.D. Iowa 2005) for that proposition that it is plaintiffs' burden to show class members could be identified "without individual inquiries."  The opinion actually does not contain this language. Much to the contrary, the court held that the definition was improper not due to the need for individual inquiries but due to the plaintiff's failure to demonstrate that individual inquiries would determine class membership. *Id.,* at 571 (rejecting argument that "caller notes" would establish class membership where plaintiffs failed to produce the notes). There is no suggestion here that class membership cannot be determined by individual inquiry, relying as it does upon objective and overwhelmingly undisputable factual evidence.

[13] *Kirkman* is one of many class actions arising from fiber optic easements.  While some courts denied class actions upon a finding that examining titles would be administratively infeasible, *see, e.g., Nudell ,* 2002 WL 1543725,  at *6,* other courts did not find this to be an insurmountable problem.  *See, e.g., Fisher.*, 217 F.R.D. at 218 (certifying class and criticizing *Nudell*) (""[I]t is questionable whether a class action could ever be certified under the [Nudell] analysis.  Every class requires some individualized inquiry to determine class membership").

*In re Coordinated Title Ins. Cases,* 784 N.Y.S.2d 919, *18 (2004) (emphasis added).  While the court recognized that the "the process of reviewing all files may indeed be immense," it was "not persuaded that the task cannot be managed."  *Id.*;[14] *see also Randleman,* 2008 WL 2323771, at *9  (creation and implementation of a mechanism for identifying and notifying class members "will no doubt be time consuming and expensive undertakings, but they are far from unknown to the federal courts."); *Mitchell-Tracey v. United Gen. Title Ins. Co.,* 237 F.R.D. 551, 560 (D. Md. 2006)  ("Although the task may prove to be a laborious one, this court is not persuaded that it is one that cannot be reasonably managed"); *Cohen v. Chi. Title Ins. Co.*, 242 F.R.D. 295, 302 (E.D. Pa. 2007) (rejecting defendant's argument that "class action would be unmanageable because it has no computerized database collecting the policies written" because "[a]bsent some affirmative evidence searches are impossible, this Court may reasonably infer and find a search for affected class members is not impossible"); *accord, Weinberg v. Hertz Corp,* 116 A.D.2d 1, 4 (1st Dep't 1986), *aff'd*, 69 N.Y.2d 979 (1987) (court not swayed by defendant's assertion that requiring search of *millions* of noncomputerized rental agreements  around the country would be unduly burdensome); *Lazar v Hertz Corp*, 143 Cal. App. 3d 128, 143 (1983) (court ruled that the benefits of the class action for small consumer claims outweighed any legal, administrative or economic burden on defendant in defining the class); *Jack Faucett Ass'n. Inc. v. AT&T Co.,* 1983 WL 4601, at *4 (D.D.C. Mar. 18, 1983) ("[E]conomy alone is an insufficient reason to justify the exclusion of class members. . .").

    With the exceptions of Defendant State Farm, which has made more than 7,000,000 risk assignments during the relevant time period, *see* Joint Brief at 14, and perhaps Ohio Casualty,

---

[14] "There is reluctance, here, as well, to halt the pursuit of alleged misconduct affecting a potentially very large number of consumers because of the state of the defendants' records."  *In re Coordinated Title Ins. Cases,* 784 N.Y.S.2d at *18.

with slightly more than 1,000,000 risk assignments made, the remaining Defendants might require a review of quantities of files similar to what the courts held was manageable in the title insurance line of cases.[15]  But, as these cases consistently have held, the difficulty of the task of reviewing files cannot be a sufficient reason to deny class certification.  "Certainly, standing alone, these tasks, which from [a] judicial standpoint, are essentially managerial and manageable, are no basis for letting [the Defendant] – if its wrongdoing is established definitively – keep monies that it never should have gotten."  *Randleman*, 2008 WL 2323771, at *9.

The task the parties face here is somewhat less daunting than that posed by the title insurance case since geo-coding software tools exist, which will greatly expedite the process.  Notwithstanding Defendants' assertions to the contrary,[16] Plaintiffs do not intend to rely exclusively on the geo-coding process to identify class members.  Plaintiffs have long acknowledged that manual identification (or verification) may also be required.[17]

Still geo-coding software has, *in this litigation*, already proven itself to be a powerful tool for identifying class members.  For that reason, Plaintiffs naturally expect to fully employ it in furtherance of providing post-certification notice and adjudicating contested claims of liability.  While the software will produce results which are not without error, these results are sufficiently adequate at this point in the litigation to satisfy the "ascertainable class" requirement.

---

[15] The parties in each of the title insurance cases were charged with the task of manually reviewing the hundreds of thousands files at issue.  *See In re Coordinated Title Ins. Cases*, 784 N.Y.S.2d *18 (manually reviewing hundreds of thousands of loan policy transactions not an insurmountable task).  The numbers here are similarly estimated to be in the hundreds of thousands:  Nationwide Mutual (339,587); American International South (68,105); Ohio Casualty/ West American (1,179,746); State Farm Auto and Fire (7,027,320).  If manual review can be limited to the estimated 5 percent that geo-coding process fails to "match" and  the incorrect assignments the software identifies, these numbers will be significantly lower.  *See* Charts at 14 & 16 of Joint Memo.: State Farm (421,369); Ohio Casualty/ West American (70,784); American International South (4,086); and, Nationwide (20,374).

[16] *See, e.g.,* Defendant Indiana Insurance Company's Separate Response in Objecting to Plaintiffs' Motion for Class Certification, Aug. 11, 2008,at 11 (No. 2:06-cv-00146-DLB, Doc. 228) ("Plaintiffs claim that defining membership in the proposed class is as simple as running the electronic data already produced by the individual Defendants through geo-coding software, pressing a few buttons, and voila!").

[17] *See* Plaintiffs' Memorandum in Support of Their Motion for Class Certification, July 10, 2008, at 4 (Doc. 333) ("Pltfs. Memo.")

a.    The Geo-coding Software Can be Used To Identify Persons <u>Who Were Charged Excess LGPT</u>.

Geo-coding software has been universally recognized as a mechanism to ensure that insureds are more accurately charged the correct LGPT and, by extension, to identify insureds who have been charged LGPT incorrectly. As noted by David E. Wildasin of the University of Kentucky, Martin School of Public Policy and Administration, in a report prepared for the Insurance Institute of Kentucky:

> Recent advances in technology provide an opportunity for significant improvements in the administration of local insurance premium taxes. In particular, improvements in geographic information systems (GIS) technology make it possible to verify the precise location of any given address. Combined with information about county and municipal boundaries, GIS technology can thus be used to determine whether a particular address, and the insurable risks attached to it, is located within a particular taxing jurisdiction. Together with knowledge of any applicable tax rates, this information can be used to determine the amounts of any taxes that may be required on a given insured risk.
> …
> The Kentucky Office of Insurance and many insurers already use GIS-based technologies for locating risks for the purpose of insurance premium taxation. KOI review and certification of such technologies could provide insurers with the certainty that their mechanisms for insurance premium tax collection meet or exceed appropriate standards and that their reliance on such technologies satisfies the risk location element of their tax compliance obligations.

D. Wildasin, "Kentucky Local Government Insurance Premium Taxation:  Opportunities for reform," (June 2008) (attached as Exhibit A to Indiana Insurance Response in Opposition to Class Certification, Aug. 18, 2008 (No. 2:06-cv-00146-DLB, Doc. 233).

As a result of this litigation, Defendant Hartford Underwriters has entered into an agreement with Group One Software that will allow it to use Group One's GeoTAX software "to determine on all new and renewed personal automobile and personal homeowners' insurance policies the amounts of Local Government Premium Taxes and Collection Fees that are owed."

Affidavit of Susan Castaneda, July 21, 2008, ¶ 9 (Doc. 336, Attachment 3).   Hartford

Underwriters also used the program to identify from its electronic records insureds who were

charged Local Government Premium Taxes or Collection fees on policy premiums that either

were not owed or at rates higher than permitted.  *Id.* ¶ 7.  Similarly, Defendant Safe Auto used

GeoTAX to identify insureds who were overcharged due to location errors and integrated

GeoTAX into the company's billing system.  *See* Affidavit of Michael Overmyer, January 15,

2008, ¶¶ 9-11 (No. 2:06-cv-00146-DLB, Doc. 155, Att. 6); *see also* Transcript of Status

Conference (May 29, 2008) ("This lawsuit, while not exactly welcomed by Acuity, has certainly

led to Acuity's systems being dramatically improved, and I think Acuity is now in a much better

position to accurately tax the citizens of the Commonwealth.").  Perhaps most telling, the

Commonwealth of Kentucky has revised KRS 91A.080—the enabling statute for the subject

insurance premium taxes—to require insurers doing any appreciable amount of business in the

Commonwealth to utilize geo-coding software beginning in 2010.  This legislative response to

the instant litigation was accomplished with the assistance of the insurance industry, which

realized (at least in the legislative context) that geo-coding helped to provide more accurate and

cogent tax jurisdiction assignment results.

Defendants' principle complaint about the use of geo-coding software in general, and

GeoTAX in particular, is its anticipated error rate in analyzing Defendants' historic policyholder

data.  While the software will in fact produce with respect to each Defendant a list of persons

that the program has determined have been overcharged, Defendants contend that the fact that

the list will not be 100% accurate precludes class certification. Defendants are wrong for several

reasons.

First, as Defendants point out (Joint Memo. at 18), it is the class definition that will determine class membership, not the results produced by geo-coding software. The output of the geo-coding software is but a first step towards identifying class members. As the proposed class definition defines the class by objective criteria, it cannot be overbroad or underbroad. Given the absence of subjective criteria, the class definition is neither indefinite nor indeterminate and permits identification of class members. Manual for Complex Litigation (Fourth) §21.222 at 270 (2004) ("An identifiable class exists if all its members can be ascertained by reference to objective criteria.").

Second, even the anticipated error rate attendant to analyzing Defendants' historic policyholder data is not so great as to preclude class certification. It is not necessary to ascertain all class members prior to class certification. *Dunnigan v. Metro. Life Ins. Co.*, 214 F.R.D. 125, 135 (S.D.N.Y. 2003) (*citing In re MTBE*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002)). As the court held in *State ex rel. Coca-Cola v. Nixon*, 249 S.W.3d 855 (Mo. 2008):

> The class definition must be sufficiently definite so that it is administratively feasible to identify members of the class. However, the class need not be so ascertainable from the definition that every potential member can be identified at the commencement of the action.

*Id.* (citations and quotations omitted). Plaintiffs do not claim to be able to identify all members of the class at this time and concede that the method they propose for initially identifying class members so that the best notice practicable may be given to them is not 100 percent accurate. But the level of error – essentially unknown,[18] but ranging from less than 30%,[19] to as low as 5%[20] – is not so great as to preclude class certification, if that rate of error is relevant to the

---

[18] Deposition of Craig Knoblock, Ph.D., June 6, 2008, ("Knoblock Depo."), p. 50:21-24 (As I stated earlier, to actually quantify the error rate on any given program involves a number of factors that I don't necessarily have available to me.") (Ex. 1, hereto).

[19] Knoblock Depo., pp. 34-35.

[20] Knoblock Depo., pp. 81-83.

analysis at all. *See generally Coca-Cola*, 249 S.W.3d 855 (class definition impermissibly overbroad where 80% of the class suffered no injury).

Third, it is a truism that class members "must be ascertainable at some point in the case." *Dunnigan*, 214 F.R.D. at 135.  Plaintiffs can ultimately ascertain the class here.  Using much the same method adopted by Kentucky Farm Bureau, Plaintiffs will use geo-coding and compare its determination of the correct tax jurisdiction with the jurisdiction listed on the policy to determine whether they match. If they do not, Plaintiffs will take additional steps to determine why the difference exists, which will include primarily contacting the local PVAs or by examining at satellite imagery and jurisdictional boundaries.[21]  By focusing on the results generated by the geo-coding software, the number of in-depth factual inquiries required of the parties which would have to be verified would only be in the tens of thousands, as Defendants candidly admit.[22]   Again, while this task may be daunting, it is not insurmountable.

Defendants repeatedly suggest that *the Court* will have to examine tens of thousands of records, yet they fail to explain why this would be so.  Given the objective criteria for class membership, there are unlikely to be any substantial factual disputes for the parties, or the Court to resolve.  A tremendous amount of work will have to be performed by the parties, to be sure, but Defendants offer no evidence to support their argument that the Court will have to engage itself in the process.[23]

Because the Classes are objectively identifiable, and because class members, even with appropriate effort, can be identified without the need for Court-supervised mini-hearings, it

---

[21] *See* Deposition of John Enright, Nov. 19, 2007, p. 8 (GeoTAX records can be confirmed by use of  satellite imagery) (Ex. 2, hereto).
[22] *See* Joint Memo. at 17 ("The number of individual inquires required for such a determination would be in the tens of  thousands.")
[23] How the work will be allocated between the parties is an issue to be resolved another day.  *See In re Coordinated Title Ins. Cases,* 784 N.Y.S. 2d at *13 (indicating that defendants will identify class members by searching their files); *Mitchell-Tracey*, 237 F.R.D. at 560 (indicating that defendants will compile information on insurance policies they issued and plaintiffs will do the work of reviewing the data to determine class membership).

cannot be said – as Defendants do – that the class definition is either under- or over-inclusive. The definition defines the class.  The members of the class can be identified.  The definition is therefore proper.

**B.**      **Each of the Proposed Classes Satisfies the Requirements of Rule 23(a).**

Contrary to Defendants' contentions, Plaintiffs have met their burden of satisfying each requirement of Rule 23(a), including numerosity, commonality, typicality and adequacy for each proposed class.  Each of these requirements is discussed, in turn, below.

**1.      Numerosity is Satisfied By the Reasonable Estimate of Class Sizes Generated by Plaintiffs.**

Notwithstanding Plaintiffs' showing that each Class is expected to consist of no fewer than several thousand members and this Court's general acknowledgement of such, three of the eight Defendants – Nationwide and both State Farm Defendants – refuse to concede numerosity.[24]  Instead, these Defendants argue that the classes of their insureds are speculative and thus not certifiable.  For several reasons, including those discussed above, *supra* 5-11, these arguments are unfounded and must be rejected.

First, numerosity is not measured by a strict numerical test.  *In re American Medical Sys.*, 75 F.3d 1069, 1079 (6th Cir. 1996).  Plaintiffs need only demonstrate the existence of the numbers of persons they seek to represent.  *Gevedon v. Purdue Pharma*, 212 F.R.D. 333, 337 (E.D. Ky. 2002).  "In making this determination, the Court may consider 'reasonable inferences drawn from the facts before it.'" *Turner v. Grant County Detention Center*, No. 05-148-DLB,

---

[24] *See* Defendant Nationwide Mutual Insurance Company's Response to Plaintiffs' Motion for Class Certification, Aug. 11, 2008, at 19- 23 (Doc. 357) ("Nationwide Res."); Opposition to Plaintiffs' Motion for Class Certification by Defendant State Farm Automobile Insurance Company and State Farm Fire and Casualty Company, Aug. 8, 2008, at16 fn. 7 (Doc. 348) ('State Farm Opp.").

2008 WL 821895, at *11 (E.D. Ky. Mar. 26, 2008) (*citing Senter v. GMC,* 532 F.2d 511, 523 (6th Cir. 1976)).

Here, as set forth in their opening memorandum, Plaintiffs have reasonably determined that each Class is likely to consist of anywhere between 270 and 9,000 members.[25]  This estimate is not, as Nationwide and State Farm claim, based on sheer speculation.  Rather, Plaintiffs have generated this number by considering the number of policies issued by each Defendant in Kentucky during the class period and applying an error rate of 1%.  That error rate is likewise tethered to record evidence:  the error rate found in prior settlements with other Defendants in this action, and Market Conduct Analyses performed by the Kentucky Office of Insurance Market Conduct.[26]  Accordingly, the numerosity requirement is satisfied.  *Bacon v. Honda of Am. Mfg.*, 370 F.3d 565, 570 (6th Cir. 2004) (the "sheer number of potential litigants in a class, especially if it is more than several hundred, can be the only factor needed to satisfy Rule 23(a)(1)").

In disputing numerosity, Defendant Nationwide, citing *Turner*, 2008 WL 821895, and *Eversole,* 2007 WL 821895, asserts that the relevant question is not "how many policies or policyholders that Nationwide has in Kentucky over the class period, but how many policyholders are likely to have suffered similar injury for similar reasons."  Plaintiffs agree, establishing numerosity not by the number of persons who have policies insured by the Defendants, but by the estimated number of persons who have paid an improper LGPT to the Defendants – just as the class definition requires.[27]

---

[25] *See* Pltfs. Memo. at 14-15.
[26] *Id.*
[27] *Turner* and *Eversole* are readily distinguishable. In *Turner*, a finding of numerosity was necessarily precluded by the  defective class definition presented by plaintiffs, which focused on unconstitutional deprivations of rights. Similarly, in *Eversole*, plaintiffs who sought certification of a class of mortgagees who did not receive timely posts of their mortgage payments failed to satisfy numerosity because they relied only on the number of mortgages serviced by the defendants, and not on the number of persons who did not receive timely posts of their payments as

Both Nationwide and State Farm cite several other plainly dissimilar cases in which the proposed class definitions and respective sizes were based on nothing more than true speculation and guesswork.  For instance, in *Golden v. City of Columbus*, 404 F.3d 950 (6th Cir. 2005), plaintiffs sought certification of a class of tenants in Columbus whose water service was or will be terminated because of a landlord's or prior tenant's indebtedness.  As proof of impracticability of joinder, plaintiffs offered the number of renters in Columbus without any estimate of those whose water service was threatened because of another's debt.  A similar problem afflicted the class definition in *Brockman v. Barton Brands, Ltd*., 2007 WL 4162920, at *4 (W.D. Ky. Nov. 21, 2007), where plaintiffs offered no evidence to explain how many of the 5,864 persons identified as residing in the geographic area covered by the definition actually fell within the zone of the pollution at issue. [28]  Obviously, these cases, which involve a complete failure of proof as to the number of class members are of no relevance here where Plaintiffs are upon record evidence able to estimate the number of persons who fall within the class definition for each Defendant.[29] Indeed, to require more might make certification of *any* class action impossible. *See Mitchell-Tracey*, 237 F.R.D. at 560.

As with the class definition, the Court's instinctive and well-reasoned reaction to the numerosity requirement was correct: "it would be ludicrous to find … that the numerosity

---

required by the definition.  Here, unlike in any of the cases cited by Defendants, Plaintiffs have taken the additional step of showing the number of persons suspected of actually suffering the damage alleged in the class definition.

[28] Notably, the Court in *Brockman* stated that "a more objectively defined class or a geographically defined class based upon better evidence is quite likely to meet the numerosity requirement, and the Court will not deem Rule 23(a)(1) to be a barrier to class certification at this time." 2007 U.S. Dist. Lexis. 86732, at *19.

[29] Nationwide and State Farm cite several other inapposite cases: *Alkire v. Irving*, 330 F.3d 802, 820 (6th Cir. 2003) (refusing numerosity where "defendants' search of jail records produced only nine potential class members"); *Gevedon,* 212 F.R.D. at 338 (numerosity not satisfied where plaintiffs offer no evidence whatsoever as to the approximate size of the class, offering instead, only information regarding total annual sales of OxyContin for the year 2000); *Smith v. First Century Bank*, No. 3:04-cv-591, 2005 WL 1840251, at *7-8 (E.D. Tenn. August 3, 2005) (plaintiffs offering proof of only the bank's total customers rather than evidence of the number of customers who actually suffered harm as alleged by the proposed class definition).

23

involved here is not sufficient to permit the Court to ultimately make that finding, if asked later in a motion to certify a class…"  Status Tr., at 61.

### 2.     Commonality is Satisfied As Core Questions of Law and Fact Can Be Established on a Class-Wide Basis.

In denying that Plaintiffs have satisfied the commonality requirement, Defendants argue that Plaintiffs have not presented a *single* issue of law or fact that is common to each Class Representative and the members of the Class he or she seeks to represent.  This argument is plainly without basis.

Commonality does not require that all class members share identical claims and facts; rather, there need only be a single issue common to all members of the class.  *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1187 (6th Cir. 1988); *In re American Medical, Sys.*, 75 F.3d at 1080.  Importantly, in order to suffice, resolution of that common issue must advance the litigation.  *Sprague v. GMC*, 133 F.3d 388, 397 (6th Cir. 1998).  Factual differences amongst the plaintiffs and/or the proposed class members will not preclude a finding of commonality. *Bentley v. Honeywell Int'l, Inc.*, 223 F.R.D. 471, 481 (S.D. Ohio 2004).  Here, Plaintiffs present, not one, but several common questions of law and fact, which, if resolved on a class-wide basis, will advance the litigation for each and every class member.

Common to each Plaintiff and the members of the Class he or she represents are the core legal questions inherent in their claims for breach of the Kentucky Illegal Dealings in Premiums statute, conversion, negligent servicing, and a declaration of rights.  These questions include the following:

- Whether Defendants have engaged in unlawful billing practices and illegal dealings pursuant to Kentucky's Illegal Dealing in Premiums statute, KRS 304.12-190;

- Whether a "charge" on a premium is a tax within the meaning of the Illegal Dealing in Premiums statute;

- Whether "willful" under the Illegal Dealing in Premiums statute requires individual proof of intent;

- Whether Defendants' collection of taxes that were either not owed or at rates higher than permitted constitutes conversion;

- Whether Defendants are authorized to charge their respective customers a collection fee that is in addition to an otherwise lawful premium tax;

- Whether Defendants owed Plaintiffs and Class Members a duty to use the best methodologies available to determine the applicable LGPT;

- Whether Defendants' charge of additional fees to Plaintiffs and Class Members violates Kentucky Department of Insurance regulations for servicing the collection of municipal taxes imposed by local governments.

The resolution of even the first three of these common questions will advance this litigation and, perhaps, dispose of the case completely. Resolution of any of the remaining questions, which will necessarily implicate the each Class as a whole, will likewise advance the litigation. As such, commonality is satisfied.

Furthermore, Plaintiffs properly analogize the common issues of fact surrounding each Defendants' failure to charge proper tax rates and collection fees to those involved in the comparable line of title insurance cases, including, most specifically, *Randleman*. Presumably because they cannot, many Defendants do not even seek to distinguish those cases. Those that do, like Nationwide, attempt to show that the methodology they used for determining appropriate tax codes was allegedly not uniform at all, instead depending largely on the information provided by individual customers and processed by individual agents.[30] The record, however, shows that many Defendants have indeed adopted a methodology for assigning and calculating municipal

---

[30] Nationwide Res. at 14.

taxes common to their insureds, a methodology which *does not* include the use of geo-coding at

the institutional level, to verify the accuracy of the tax assignments:

- Nationwide: Although substantively identical information is gathered by all agents and relied upon for creation of policies and attendant bills, Nationwide does *not* have a policy of verifying the accuracy of assignments using geo-coding. *See* Deposition of Julie Cobb, May 21, 2008, pp. 19, 30 (Ex. 3, hereto) (stating that Nationwide does not direct or encourage the use of additional software or resources by agents to verify the accuracy of tax code assignments).

- Ohio Casualty and West American: Ohio Casualty and West American rely principally on the knowledge of their agents to select the appropriate tax assignment for the insured. Though certain secondary sources, such as "maps or internet services such as Yahoo or Google Maps, contacting the offices of the county auditors, and consultation with the software program ISO Location, Finalist and the USPS data tables," are available to them, there is no company-wide or company-directed use of these secondary sources to verify the accuracy of a municipal tax assignment of insured risks. Deposition of Tom Siehl, April 3, 2008, pp. 36, 38 (Ex. 4, hereto).

- American International South:  American International South does not mandate a company-wide policy or practice of using certain available resources, such as the U.S. Census Bureau or Local PVA websites, to verify the geographical accuracy of tax assignments.  Deposition of Ryan Hupp, May 8, 2008, at 41 (Ex. 5, hereto).

- State Farm: Prior to 2007, State Farm did not require agents to use any reference source to assist in confirming the correct location of an insureds' risks.[31]  Deposition of Susan Manuel, June 6, 2008, pp. 23-24 ("Manuel Depo.") (Ex. 6, hereto). Thus, State Farm relied only on the information provided by the insured until this time.  *Id.*

- Standard Fire and Travelers: State Fire and Travelers rely primarily on the knowledge of their local agents to determine municipal tax assignments for insured risks.  While those agents may have at their disposal certain "secondary resources," i.e. U.S. Census Bureau or local Property Valuation Administrator (PVA) websites, there is no company-wide or company-directed use of these secondary sources to verify the accuracy of a municipal tax assignment of insured risks.  *See* Deposition of Joe Fagan, May 20, 2008, pp. 27-30 ("Fagan Depo.") (Ex. 7, hereto); Deposition of Dave Fleming, May 20, 2008, pp. 47-49 (Ex. 8, hereto).  Travelers notes that it uses the Atlas III program on the "front-end" of the application process to input the information from the applicant, but the agent is ultimately responsible for inputting the correct county tax code in the "garaging field" of

---

[31] During the fourth quarter of 2007, State Farm began using Tele-Atlas, a type of geo-coding, to assist its agents in identifying correct municipalities for renewal policies. Manuel Depo., pp. 36, 61-62.  State Farm explains that it will use this process when assigning new policies in the fourth quarter of 2008.  *Id.* at 62.  Because State Farm has adopted the Tele-Atlas program, Plaintiffs allege that State Farm engaged in the routine practice of failing to use appropriate means to verify the location of its insured's property until the end of 2007.

Atlas III. Fagan Depo., p. 22. Travelers does not use any program to cross check the accuracy of the information inputted into Atlas III. *Id.*, pp. 27-28.

As such, the finding of commonality is strengthened as to those Defendants who, like those implicated in *Randleman* engaged in a routine and standardized process. *See also Bentley,* 223 F.R.D. at 481 (commonality is satisfied where "the defendant has engaged in some standardized conduct toward the proposed class members.") (internal citations omitted); *Rankin v. Rots*, 220 F.R.D. 511, 523 (E.D. Mich. 2004) (same).

### 3.   Typicality is Satisfied as the Claims of the Class Representatives and the Class Members are Premised on Identical Theories.

The Plaintiffs' claims are typical of those belonging to the members of each of the Classes he or she seeks to represent because all of their claims arise from each Defendants' charge of improper municipal taxes and collection fees. As a result of Defendants' misconduct, Plaintiffs and Class Members alike have paid improper premium taxes and collection fees and have thus suffered the same injury for which they seek recovery through the causes of action asserted here.[32]  Thus, the proof ultimately necessary for the Plaintiffs to prevail is the same that

---

[32] Deposition of Craig Kendrick, May 2, 2008, pp. 7, 14 (stating that Ohio Casualty included a charge for a Florence, Kentucky premium tax on his premium statement even though his residence is not in the city limits) (Ex. 10, hereto) ("Kendrick Depo."); Deposition of Karla McCullough, Aug. 13, 2008, p. 11 (stating that she does not think that it was fair that she paid taxes when they were not owed) (Ex. 11, hereto) ("McCullough Depo.); Deposition of Robert Dyas, Nov. 8, 2007, p. 16 (stating that he is suing State Farm because taxes were included in his insurance premiums when the taxes were not owed) (Ex. 12, hereto) ("R. Dyas Depo."); *see also* Deposition of Johanna Dyas, Nov. 8, 2007, p. 14 (stating that they paid taxes that were not owed) (Ex. 13, hereto) ("J. Dyas Depo."); Deposition of Gary Wilson, Nov. 8, 2007, pp. 15-16; 19-20 (testifying that he and his wife reside in an unincorporated area of Boone County and have been overcharged local government premium taxes because of their Walton mailing address; and, stating that he understands that State Farm is also charging an improper collection fee when State Farm includes the tax in his premium) (Ex. 13,hereto) ("G. Wilson Depo."); Exhibits A and B to *Martha Yunker's Answers to Defendants' First Set of Master Interrogatories and Requests for Production of Documents to Plaintiffs on Class Issues*, Sept. 6, 2007 (showing that Ms. Yunker was charged improper taxes on her homeowner's and automobile policies). (Ex. 14, hereto) ("Yunker Rog."); Deposition of Diana Young, Oct. 22, 2007, pp. 19-20 (stating that she is certain that she was overcharged on her premiums because taxes that were not owed were included in premium statements after they moved to Deer Trace in 2004) (Ex. 15, hereto) ("D. Young Depo."); *see also* Deposition of Jason Young, Oct. 22, 2007, p. 12 (contending that Nationwide has included charges in their customers' premium statements that were not owed) (Ex. 16, hereto) ("J. Young Depo."); Deposition of John Nicholas, May 2, 2008, pp. 27, 43,44 (stating that he knows that a premium charge for the insurance covering the Morningview property included an improper tax) (Ex. 17, hereto) ("Nicholas Depo."). As such, each of these

will be necessary for the members of the putative Classes.  No further analysis is required to establish typicality.  *In re American Med. Sys*., 75 F.3d at 1082 (typicality is satisfied where plaintiffs show that their "injury arises from or is directly related to a wrong to a class, and that wrong includes the wrong to the plaintiff"); *Beattie v. Century Tel, Inc*., 511 F.3d 554, 561 (6th Cir. 2007) (finding typicality, despite individual issues, as plaintiffs claims "arise from the same allegedly deceptive billing practice that gives rise to the claims of the other class members").

Defendants contend that the Plaintiffs' claims are atypical because their resolution will not resolve the claims belonging to the Class Members.  In so arguing, Defendants emphasize that whether a particular individual paid a tax that was not owed is a fact question unique to them which requires a review of individual proof.  Yet this focus on the individual objective facts ignores the very issues that make the Class Representatives claims typical.  Once class membership has been determined using the objective procedures described above, the factual and legal issues <u>remaining</u> will be common to all and the Class Representatives' claims will be a "typical" exemplar.  Stated differently, once class membership has been determined, the Plaintiffs and their respective Classes will be left with common and typical claims for recovery of their overpayments.

Each Defendant, seeking to show a lack of commonality and typicality, highlights the individual circumstances surrounding their respective Class Representative's claims.  The facts argued by Defendants include that the various Plaintiffs allegedly: represented on his/her application that his/her insured risk was within city boundaries;[33] failed to inform his/her agent

---

Representatives has claims against their Defendant for violation of the Illegal Dealings in Premium statute, conversion, negligent servicing, as well as declaratory rights.

[33] *See* State Farm Opp.; Memorandum in Opposition to Plaintiffs' Motion for Class Certification of Defendants Ohio Casualty Insurance Company and West American Insurance Company, Aug. 11, 2008, Doc. 349; Defendant Travelers Property Casualty Insurance Company's and  Standard Fire Insurance Company's Response to Plaintiffs' Motion for Class Certification, Aug. 11, 2008, Doc. 355 ("Ohio Casualty Opp.").

that the insured risks were not within city boundaries;[34] or remained uncertain as to what municipality his/her property was in during a conversation with an agent or at their deposition.[35] Contrary to Defendants' efforts to inject meaningful distinctions, these variations of fact (that relate primarily to Defendant's individualized affirmative defenses) are inconsequential as each Plaintiff ultimately shares with the members of their respective Class the same kind of damage caused by each Defendant's assignment of an improper tax code.[36] As the Sixth Circuit has made clear, in order to find that typicality is satisfied, "a representative's claims need not involve the same facts or law, provided that there is a common element of fact of law." *Senter,* 532 F.2d at 525, n. 31.   In fact, some courts have held that "typicality may exist where there is a very strong similarity of legal theories, even if substantial factual distinctions exist between the named and unnamed class members." *Rankin*, 220 F.R.D. at 518.

Defendants cite to a number of inapposite cases in support of their contentions that commonality and typicality are not established here.  These cases are simply not instructive.  For instance, in *Kurczi v. Eli Lilly & Company,* 113 F.3d 1426 (6th Cir. 1997) and *Ball v. Union Carbide Corp.,* 385 F.3d 713 (6th Cir.2004) the Sixth Circuit affirmed that findings of commonality and typicality were inappropriate considering the highly individualized nature of medical monitoring and toxic injury claims, which require evidence concerning each person's

---

[34] *See* State Farm Opp.; Ohio Casualty Opp.

[35] See State Farm Opp.; Defendant American International South Insurance Company's Opposition to Plaintiffs' Motion for Class Certification, Aug. 11, 2008 (Doc. 361).

[36] Defendant Nationwide suggests that the Youngs are uniquely atypical class representatives because their address was entered incorrectly into Nationwide's system as Deerchase rather than Deer Trace.  Nationwide Memo. at 25. Nationwide, however, offers no evidence that this error alters the Youngs' claims or makes them any different from those belonging to the class members they seek to represent.  Indeed, despite this slight variation of circumstances, the fact remains that the Youngs were charged municipal premium taxes and collection fees that were not owed— which is precisely why Nationwide surreptitiously refunded the over-paid taxes.  *See* Section 4(a)(1), *infra*.  The Youngs have thus suffered the same injury as the Class Members and consequently have the same claims against Nationwide.

medical causation, toxic exposure, and medical history.[37]  Likewise, in *In re American Medical Sys.*, the Court's refusal to find commonality or typicality was driven by the fact that the claims of plaintiffs would drastically vary depending upon the model and failure of the allegedly defective penile prostheses, as well as the anatomy of the individual patient.  75 F.3d at 1081. Also preclusive of typicality there was the fact that each named-plaintiff experienced a distinct difficulty with the product, making it impossible to demonstrate that their claims would be typical of each other much less a class.  *Id.* at 1082.

Defendants further note an employment discrimination case, *Bacon v. Honda of America*, in which typicality was not found because plaintiffs were unable to establish that defendant's alleged discrimination was the result of entirely subjective decision-making processes, rather than individual reasoning.  370 F.3d 565, 572 (6th Cir. 2004).  In a similar case, *Sprague v. GMC*, the Sixth Circuit denied certification finding, in part, that commonality and typicality were impaired by the fact that individual members of the proposed retiree class had received widely disparate statements from defendant as to their retiree plans. 133 F.3d 388.[38]

Obviously, Plaintiffs' claims here involve no such complex individual determinations that could prevent the Plaintiffs from sharing common and typical claims and injuries with the members of each Class.  Here, unlike in *Bacon* and *Sprague*, the information communicated between Plaintiffs and Class Members and the Defendants, if relevant, is substantively identical:

---

[37] In *Kurczi* plaintiffs sought to certify a class of women who had suffered damage to their reproductive systems due to their exposure in utero to diethylstilbestrol (DES) between 1948 and 1962, but the Court found that commonality and typicality could not be found given the innumerable variations as to each individual's DES exposure and medical causation, and each defendants' warnings and representations 113 F.3d 1426.  Similarly, in *Ball,* the Court found that commonality and typicality could not be established because individual questions as to each class member's medical history, diet, sex, age, and toxic exposure were necessary to determine liability.  385 F.3d at 727.
[38] Defendants Travelers Property and Standard Fire note another dissimilar case, *Ploog v. HomeSide Lending, Inc*., 2001 WL 1155288 (N.D. Ill. 2001), where the court found that typicality could not be satisfied because the individual correspondence between the plaintiffs and defendants was crucial to their RESPA claims.  Here, on the other hand, the specifics of the conversations occurring between Plaintiff and these Defendants' agents are not relevant in establishing liability.

each individual sought an insurance policy from an insurance agent and was assigned an improper tax code, which caused them to be charged taxes and fees that were not owed.[39]

> **4.      Adequacy is Satisfied as the Record Plainly Demonstrates that the Class Representatives and their Counsel have Vigorously Prosecuted this Class Action without Conflict.**

The adequacy standard under Rule 23(a)(4) has two prongs: "(1) the [class] representative must have common interests with unnamed members of the class, and (2) it must appear that the representative will vigorously prosecute the interests of the class through qualified counsel." *In re American Medical Sys. Inc.*, 75 F.3d at 1083; *Senter*, 532 F.2d at 524-25.  The Sixth Circuit has explained that it "reviews the adequacy of class representation to determine whether class counsel are qualified, experienced and generally able to conduct the litigation and to consider whether the class members have interests that are not antagonistic to one another."  *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000).  "While Plaintiffs have the burden of persuasion, adequacy is presumed in the absence of evidence to the contrary." *Adams v. Federal Materials Co., Inc.*, 2006 WL 3772065, at *9 (W.D. Ky. Dec. 19, 2006)).  Though Defendants Nationwide, State Farm, Ohio Casualty, West American, and American International South have expressly contested the adequacy of the proposed Class Representatives, Plaintiffs show below that none of these challenges convincingly casts doubt as to the ability of these Plaintiffs to represent their respective Classes vigorously and without conflict.[40]

---

[39] Defendant Nationwide's reliance on *Turner* is again misplaced. 2008 U.S. Dist. Lexis 24210, at *57. There, plaintiffs sought to certify a class that was not only riddled with highly individualized issues, but also included so many different types of alleged injuries and potential causes that plaintiffs effectively sought "to represent a class of persons well beyond that which they bring themselves."  *Id.*  Such is certainly not the case here where Plaintiffs allege the same damages caused by the same institutional misconduct.

[40] Defendants Standard Fire and Travelers have not contested Ms. Yunker's ability to serve as an adequate Class Representative pursuant to Rule 23(a)(4).  As such, Ms. Yunker's adequacy is presumed.  It may be noted that Ms. Yunker has also served as an adequate class representative in the related class action settlement with Hartford.

### a.     <u>The Class Representatives Have and Will Continue to Vigorously Prosecute their Class' Claims.</u>

The record illustrates that each Plaintiffs' conduct in this litigation has been vigorous thus far and in the best interest of the Classes they seek to represent.  In particular, each Plaintiff has demonstrated commitment to this case as well as sufficient knowledge concerning the allegations, damage theories, and other relevant issues involved.  Moreover, there is no evidence of conflicts existing between the Class Representatives and any of the Members of the Classes.  Accordingly, Defendants efforts to portray Plaintiffs as anything but adequate are unavailing.

### (1)     **Jason and Diana Young are Adequate Representatives of the Nationwide Mutual Insurance Class.**

Defendant Nationwide Insurance's challenge of the Youngs' adequacy is twofold:  first, because Nationwide surreptitiously credited the Youngs' account for the amount of taxes that it charged during the relevant class period, Nationwide argues that the Youngs no longer have standing or incentive to pursue their claims on behalf of the Class.  Second, Nationwide contends that the Youngs do not understand the case or their role in it.[41]  Neither of these challenges effectively undermine the Youngs' adequacy to serve as Class Representatives in this litigation.[42]

Though Nationwide has credited the Youngs' account for the amount of the taxes collected some months after this litigation was filed, it did so *without* any accounting, release, offer of judgment, or prior notice to their legal counsel.  Nationwide simply administered the credits in 2006-2007, without even explaining to the Youngs that the credits were due to being overcharged LGPT.  *See* D. Young Depo., pp. 86-87.  In fact, the credit was discovered only

---

[41] For the same reasons that the Youngs' factual circumstances do not cause them to possess atypical claims, they do not cause them to be inadequate class representatives as Nationwide suggests. Nationwide Memo. at 31.

[42] Defendant Nationwide also notes that the Youngs are both atypical and inadequate because they have stated in their depositions that Defendants did not engage in any intentional conduct.  This, however, is irrelevant for purposes of class certification as the question of whether Defendant engaged in any intentional conduct necessary to establish the legal claims is one of law and thus inappropriate for consideration at this time.

because the Youngs did not receive a premium statement for consecutive months.  The circumstances of the credit suggest quite clearly that Nationwide was circumventing the plaintiffs' legal counsel and crediting claimed damages directly to an unwitting party opponent, in hopes of securing the very substantive legal advantage Nationwide is now attempting to assert.

Despite Nationwide's attempt to moot the Youngs' allegations, their claims are not moot. They are seeking damages not only in the amount of the actual overpayment of premiums, but also prejudgment interest on this amount, costs and attorneys' fees.  To moot their entire case, Nationwide must moot all of the plaintiffs' demands, including prejudgment interest, costs, and fees.  Only then will no dispute remain between the parties.  *In re DSC Limited*, 486 F.3d 940, 945 (6th Cir. 2007) ("A claim becomes moot only 'when plaintiff receives the relief sought or when it is factually, not legally, impossible to receive such relief.'") (internal citations omitted).

The fact that the Youngs have received some form of credit has not impaired their adequacy to serve as Class Representatives.  Indeed, the Youngs have shown their commitment to their Class by being deposed, answering interrogatories, and producing documents.  The Youngs have even conferred with counsel about the decision to hire experts in this litigation and have expressed their willingness to assume some costs in this litigation.  D. Young Depo. pp. 33, 34; J. Young Depo. pp. 16, 17.

Nationwide's second challenge to the Youngs' adequacy on the grounds that they lack a sophisticated understanding of the legal theories of their case is likewise without merit.  In *Surowitz v. Hilton Hotel*, the United States Supreme Court held that a class representative is adequate as long as her interests do not conflict with the interests of the putative class and the case is prosecuted vigorously.  Given this standard, the Court found Surowitz to be an adequate class representative despite her limited knowledge of her case:

> Mrs. Surowitz showed in her answers to questions that she did not understand the complaint at all, that she could not explain the statements made in the complaint, that she had a very small degrees of knowledge as to what the lawsuit was about, that she did not know any of the defendants by name, that she did not know the nature of the alleged misconduct, and in fact in signing the verification she had merely relied on what her son-in-law had explained to her about the facts of the case.

383 U.S. 363, 366 (1966)

Courts have held that under *Surowitz* a named plaintiff is not required to be familiar with the contents of pleadings that basically are concerned with technical legal matters or explain the facts relating to other victims of the challenged conduct. *Kamen v. Kemper Financial Services, Inc.*, 908 F.2d 1338, 1349 (7th Cir. 1990), *rev'd on other grounds*, 500 U.S. 90 (1991) ("When defendant's counsel took [plaintiff's deposition] and learned that she knew little about either the fund or the case and had given counsel free reign, they learned only that this case fits the norm."). The contention that the Youngs are not sufficiently knowledgeable about this litigation to serve as class representatives is therefore without merit.

(2) **Gary and Susan Wilson and Robert and Johnna Dyas are Adequate Representatives of the State Farm Classes**

Challenging adequacy, the State Farm Defendants contend that the Wilson and Dyas Plaintiffs have not produced any evidence to show that Rule 23(a)(4) is satisfied. In particular, State Farm emphasizes that Plaintiffs have not submitted affidavits to establish that they understand their duties and will vigorously prosecute interest of the class.[43] Absent any authority that they were affirmatively *required* to produce affidavits to satisfy adequacy, Plaintiffs refer this Court to the record, which unquestionably demonstrates the Wilsons' and Dyas' adequacy to serve as class representatives.

---

[43] State Farm Memo. at 22.

The Wilsons have shown they are committed to the advancement of this class action and sufficiently knowledgeable as to the issues involved.  At the time of his deposition, Mr. Wilson demonstrated his knowledge of the action by explaining that he and his wife reside in an unincorporated area of Boone County and have been overcharged local government premium taxes because of their Walton mailing address. G. Wilson Depo., pp. 15-16.  Mr. Wilson explained that his insurance application was completed by a State Farm agent in Georgetown, Kentucky before he relocated to Boone County and that State Farm's agent who informed him that it was not necessary to use an agent local to Boone County.

At his deposition, Mr. Wilson further testified that he was not familiar with Boone County and that he trusted the State Farm agent to know the jurisdictional boundaries of the area where she was writing coverage.  *Id.* at pp. 30-34.  Nevertheless, he <u>specifically</u> told State Farm's agent that his new home was not in the city limits even though it had a Walton mailing address. *Id*. at pp. 35-36.  Mr. Wilson also understands that State Farm is also charging an improper collection fee when State Farm includes the tax in his premium.  *Id.* at pp. 19-20.  Mr. Wilson further testified that as a Class Representative he understands his responsibilities and that he is even willing to contribute to the financing of this case. *Id.* at pp. 20-21.  Mr. Wilson believes that this lawsuit is an appropriate means to correct the errors that are occurring on consumers' premium statements and that anyone who has been overcharged should be reimbursed. *Id.* at pp. 30-31; 52.

Similarly, Robert and Johnna Dyas, customers of State Farm Fire and Casualty Co., are indisputably adequate class representatives.  At his deposition, Mr. Dyas demonstrated his knowledge of this case, testifying that he is suing State Farm because taxes were included in his insurance premiums when the taxes were not owed. R. Dyas Depo., p.16. Mr. Dyas has also

made clear that he understands that if this case is certified as a class action he will be a Class Representative and that if necessary, he is willing to contribute money to the cause. *Id.* at p. 18.

(3) <b>Craig Kendrick is an Adequate Representative of the Ohio Casualty Class.</b>

Defendant Ohio Casualty challenges Craig Kendrick's adequacy to serve as a class representative solely on the grounds that he is willing to abandon several claims originally asserted in the class complaint.  As discussed below, however, Mr. Kendrick's decision to forgo those claims that are not in the best interest of the Class does not in manner impair his adequacy.

In fact, Mr. Kendrick has served as a fully committed class representative.  He has hired counsel who he believed was qualified to represent his interests and those of the proposed class based on their litigation experience and their ability to be prepared to put in the work necessary to represent a class.  Kendrick Depo., p.18.   Mr. Kendrick has been deposed in this litigation and has testified that Ohio Casualty included a charge for a Florence, Kentucky premium tax on his premium statement even though his residence is not within the Florence city limits.  *Id.*, pp. 7, 14.  Mr. Kendrick testified that "there is no doubt that I paid the premium taxes," to which counsel for Ohio Casualty stated "I understand that."  *Id.*, p. 28

(4) <b>John Nicholas is an Adequate Representative of the West American Class.</b>

Defendant West American has attacked John Nicholas' ability to impartially represent the class, based on a relationship between three of Plaintiffs' attorneys and Mr. Nicholas' wife, Beth. West American alleges that Beth Nicholas' employment with Kenton County, where Mr. Garry Edmondson serves as County Attorney, and Mr. Christopher S. Nordloh and Mr. Jason V. Reed are Assistant County Attorneys, creates the "appearance of lack of independence." (West American's Response to Motion for Class Certification, p. 22 (Doc. 349))  West American's

36

specific claim of inadequacy of representation is that Mr. Nicholas might be serving as representative for reasons that have more to do with his wife's "connection" with Plaintiffs' counsel, than his own reasons and motivation to promote the interests of the class. *Id.*

Not surprisingly, West American does not cite any evidence in support of its allegations. Moreover, it fails to explain for the Court (or even speculate) how either Mr. Reed or Mr. Nordloh, as Assistant County Attorneys, may be in a position to "influence the career of Plaintiff Nicholas's wife [Beth]." *Id.*  Notwithstanding Defendant's purported concern with how all of this may look, the evidence amply supports Mr. Nicholas's adequacy and clearly establishes the opposite of what West American says is an "appearance of lack of independence."

First, Mr. Nicholas has been insured with West American for over 35 years. Nicholas Depo., p. 12.  Mr. Nicholas has known Garry Edmondson for more than 40 years. *Id.*, p.18.  Mr. Nicholas asked Garry Edmondson to review his policies with West American to determine if the premium charges were accurate. *Id.*  John Nicholas's wife, Beth, also happens to be employed by Kenton County, where she has worked in secretarial roles for the previous15 years.  Beth is a receptionist for the "bad check" program administered by the Kenton County Attorney's Office. *Id.*, pp.11-12.  Despite this coincidence, there is no evidence whatsoever that Mr. Nicholas's interest in pursuing his claims against West American in a class action lawsuit has any connection to his wife's career path in the past, present or future.  Indeed, West American did not even depose Beth Nicholas and it is unlikely her testimony would even be necessary at trial.

Second, *Susman v. Lincoln American Corp.,* 561 F.2d 86 (7th Cir. 1977), does not support West American's argument. In *Susman,* the issue was whether the named plaintiff could adequately represent the class when the named plaintiff's attorney was his own brother or his law partner. In those situations, a conflict of interest may arise because the named plaintiff's attorney

might compromise the interests of absent class members to protect his own right to attorney's fees. *Id.* at 91. These concerns, while valid in *Susman,* are not present here.  *See McDaniel v. North American Indem., N.V.,* No. IP-02-C-0422, 2003 WL 260704,  at *4 -5 (S.D. Ind. Jan. 27, 2003) (rejecting defendant's attack of plaintiff's counsel's ability to impartially represent the class based on a familial relationship between one of the attorneys and a third party who allegedly advised some of defendant's sponsors).

(5)    **Karla McCullough is an Adequate Representative of the American International South Class.**

Defendant American International South does little to contest the adequacy of Plaintiff Karla McCullough, arguing only that she cannot serve as an appropriate class representative because her claims are atypical of the class.  This argument is premised on the existence of irrelevant factual variations between Ms. McCullough and the Class Members concerning the process by which her tax code was assigned.  However, the fact that Ms. McCullough was unsure about which municipality she lived in and did not inform her agent that she was living in two different places, does not alter her claim that she was improperly charged a local premium tax that was not owed, or that this mistake would have been avoided had American International South verified the accuracy of tax assignment as it later did.[44]  These factual distinctions are not sufficient to preclude any Rule 23(a) requirement.  Where adequacy may be presumed in the absence of specific arguments as to *how* these facts allegedly affect Ms. McCullough's ability to vigorously represent her class without any conflict, Plaintiffs nonetheless emphasize that Ms. McCullough has in fact served as a sufficiently adequate representative thus far.

---

[44] Although it states that the review of Ms. McCullough's policy information could not have been computer generated because its agents are not required to provide specific garaging addresses for each vehicle, American International proves that manual verification was both possible and effective.  American International South Memo. at 5.  On the basis of this review, American International South was able to calculate Ms. McCullough's overpayment and to tender a refund of the amount overpaid.

Like the other Class Representatives, Ms. McCullough has timely produced relevant documents, responses to Defendants' interrogatories, and has had her deposition taken. At her deposition, Ms. McCullough expressed her sentiment that she does not think that it was fair that she paid taxes when they were not owed. McCullough Depo., p. 11. Fully committed to this class action, Ms. McCullough has even rejected a settlement of her individual claim in furtherance of her broader duty to the remaining Class.

*       *       *

To object to any of these Plaintiffs' adequacy now, after each of them has been fully engaged in protracted litigation and discovery proceedings, rings hollow. These Plaintiffs have answered reams of written discovery questions, produced documents, attended class certification discovery depositions, cooperated with counsel, rejected premature settlement overtures that did not protect the overall interests of the putative class, and in every conceivable way these Plaintiffs have vigorously represented the interests of the Classes each seeks to represent. Defendants' adequacy challenges must therefore be rejected.

> **b.** **The Class Representatives' Decision to Pursue Certification of Certain Claims and Not Others is in the Best Interest of the Classes.**

Several Defendants have challenged the adequacy of the proposed Class Representatives based on their willingness not to press for class certification of several claims alleged in the Complaint.[45] The Plaintiffs, however, are under no obligation to seek class certification of all possible legal theories or claims that any class member could assert against a Defendant. Indeed, "[t]he fact that counsel have not tried to press claims against [the defendant] which they believe (and justifiably so) are unsuitable for class treatment does not make them inadequate. To the contrary, that is the proper course for them to take." *Sullivan v. Chase Inv. Serv. Inc.*, 79 F.R.D.

---

[45] This argument is asserted by Defendants State Farm, West American, and Ohio Casualty.

246, 258 (N.D. Cal. 1978); *accord Microsoft Corp. v. Manning*, 914 S.W.2d 602 (Tex. App. 1995).  It is well-established that in the context of a class action, the named plaintiffs can and should limit their claims to ones amenable to class action treatment.  As the Court held in *Sullivan*:

> Clients who have claims not raised in this class action because the claims are unsuitable for class treatment can bring those claims on any individual basis, and res judicata will not bar those claims because absent class members have had no opportunity to litigate those issues in this lawsuit.  What defendants have characterized as 'splitting' causes of action is perfectly appropriate under Rule 23. It is not uncommon for defendant to engage in a course of conduct which gives rise to a variety of claims, some amendable to class treatment, others not.  Those claims that are amenable should be prosecuted as class actions in order to realize the savings of resources of courts and parties that Rule 23 is designed to facilitate. Class representatives must press all claims which can be prosecuted on a class basis, but they need not and should not press for certification of claims that are unsuitable for class treatment.

79 F.R.D. at 265 (citations omitted).

Defendants nevertheless argue that class representatives cannot "split" their claims and waive any claims for the class members.  That is not what is happening here.  Although some claims will not be litigated in this action, Class Members who elect to pursue dropped claims will not be estopped by *res judicata* from pursuing them individually, provided that the notice of the class actions expressly excludes such claims, and all class members are provided the opportunity to opt-out of the class. *See, e.g., Twigg v. Sears and Roebuck & Co.*, 153 F. 3d 1222, 1226-1229 (11th Cir. 1998); *see also Carnegie v. Mutual Sav. Life Ins. Co.*, 2002 WL 32989594, at *11 (N.D. Ala. Nov. 1, 2002) (conflicts between class representatives and class members are "minimized" if class certified with the right to opt-out).

Defendants mistakenly rely on *Feinstein v. Firestone Tire and Rubber Co*., 535 F. Supp. 595 (S.D.N.Y. 1982), *Pearl v. Allied Corporation*, 102 F.R.D. 921 (E.D. Pa. 1984), and *Zachary v. Texaco Exploration*, 185 F.R.D. 230 (W.D. Tex. 1999) to suggest that the Class

Representatives' decision to advance certain claims and not others diminishes their adequacy. These cases offer no such support.  In each, the court was troubled by the plaintiff's abandonment of potential <u>remedies</u>, not claims.  Here, however, Plaintiffs' decision to forgo certain claims does not affect the ultimate recovery sought.  In other words, there is no concern that a non-named plaintiff may lose its rights to recover a different <u>remedy</u> from the same Defendant for the same action.   Regardless of the cause of action pursued here, Plaintiffs and Class Members will recover the exact same remedy, which is presumably the only one available: the amount of improperly charged municipal tax and collection fee.[46]  Defendants' efforts to analogize these cases are thus futile.  *See Feinstein*, 535 F. Supp. at 599 (plaintiffs abandoned claims for death, personal injury and accident-related property damage); *Pearl*, 102 F.R.D. at 922 (plaintiffs abandoned claims for personal injury and property damage); *Zachery*, 185 F.R.D. at 243-44 (plaintiffs abandoned compensatory and punitive damage claims in Rule 23(b)(2) class action which did not include an opt-out provision).

**c.**      <u>Plaintiffs Have Retained Counsel Experienced in Class Action Litigation.</u>

Finally, the State Farm Defendants take the lone position of arguing against the adequacy of Plaintiffs' counsel based a December 2007 hearing in which one of Plaintiffs' attorneys stated that when the suit was first filed in June 2006, he lacked experience in class action litigation.  *See* State Farm Memo. at 23, n. 14.  In their zeal, however, State Farm mischaracterizes the exchange and take counsel's comments out of context.

---

[46] Plaintiffs have chosen not to pursue punitive damages in this action because they believe that the factual record does not support such recovery.  This decision is not guided by Plaintiffs' desire to improve manageability of their Classes or avoid individualized issues that may complicate class certification.  In fact, Plaintiffs do not believe that claims for punitive damages would implicate individualized issues capable of defeating certification here.  *See, e.g., Sterling*, 855 F.2d at 1217 ("So long as the court determines the defendant's liability and awards representative class members compensatory damages, the district court may in its discretion award punitive damages to the class as a whole at that time.").

As the Court will specifically recall, since it was involved in the exchange with Mr. Reed, the Court had inquired of counsel, "Let me ask you a blunt question.  Of all the claims you have, give me your best one or two claims."  Mr. Mason deferred the question to Mr. Reed, who candidly and humbly answered:  "Judge, we appreciate your concerns [that some causes of action appear more viable than others], and we share them to some extent.  I can be candid and proudly say in front of both Alex [Edmondson] and Chris [Nordloh], we filed this suit back in June of last year completely inexperienced in class action litigation.  We've learned a lot here."

The Court recognized, "[B]ringing in other[ counsel] is probably wise," and went on to later add in recognition of counsel's acknowledgment that some claims were more viable than others, "frankly, I appreciate your candor."

As the Court has already recognized, and what it is more than clear that since the inception of this case, Plaintiffs have retained additional counsel, including The Mason Law Firm, LLP and Whitfield & Cox, P.S.C., who are widely experienced and competent in class action litigation.  *See* Firm Resumes attached as Exhibits 6-8 to Plaintiffs' Opening Memorandum.  Gary E. Mason has devoted his practice exclusively to class actions for more than 18 years and has achieved national recognition for his success in resolving numerous highly complex consumer class actions.  *Id*. Since the time of counsel's comments, the Court has also approved all of the undersigned counsel as adequate to serve as counsel to multiple settlement classes.  And, in any event, the question is not whether Mssrs. Edmondson, Nordloh and Reed were adequate class counsel at the time this action was filed:  the question is whether the counsel identified by Plaintiffs are, at this juncture, adequate to serve as class counsel.[47]

---

[47] In further support, Plaintiffs have also filed contemporaneous herewith a separate but supplemental Reply to Defendant's Supplemental Joint Response in Opposition to Class Certification on the Basis of Adequacy of Class Counsel, Sept. 12, 2008 [ Doc. 384].  The arguments contained in the Plaintiffs' Reply are incorporated herein by reference.

State Farm's singular and ill-supported argument regarding the adequacy of counsel should be rejected. *Ballan v. Upjohn Co.*, 159 F.R.D. 473, 487-88 (W.D. Mich. 1994) (recognizing that in the absence of a showing to the contrary, adequacy of counsel is often presumed).[48]

### C.   Each of the Classes Satisfy the Requirements of Rule 23(b).

The common factual and legal issues discussed above qualitatively predominate over each and every individualized consideration presented by Defendants.[49]   Moreover, a class action is the best means of adjudicating this controversy.  As shown below, Defendants' contention that Rule 23(b)(3) is not met here is unavailing.

### 1.   Common Questions of Law or Fact Predominate Over Individual Questions.

In an effort to show that countless individual inquiries will engulf the core common questions of liability, Defendants resurrect the same arguments asserted to dispute the appropriateness of Plaintiffs' class definition.  Just as these arguments fail to defeat the class definition, they do nothing to show that individual issues will predominate this litigation.

---

[48]Defendants State Farm, Ohio Casualty and West American also claim that Plaintiffs have failed to offer evidence to support the four determinations this Court is required to make under Rule 23(g)(1)(A) in appointing class counsel. This rule requires the Court to consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the application law; and (iv) the resources that counsel will commit to representing the class.  Plaintiffs believe that the resumes of their counsel should sufficiently guide this Court with this determination.  Plaintiffs also note that counsels' work in identifying and investigating the potential claims of plaintiffs is clear as they have considered numerous causes of actions, some of which they recognized had to be abandoned following further research.  As to the final inquiry, Plaintiffs' counsel submit that they have the resources needed to pursue this action and will utilize them as necessary.

[49] Assuming *arguendo*, that certification of some or all of the proposed Classes is not appropriate under Rule 23(b)(3), the Court may nonetheless certify those causes of action it finds common under Rule 23(c)(4).  *See Castano v. American Tobacco Co.,* 84 F.3d 734, 745 n.21 (5th Cir. 1996) ("The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial.").

It is important to note that satisfying the predominance requirement does not require negating the existence of any and all individualized issues, as Defendants seem to suggest. Rather, the proper inquiry is whether common issues predominate, or, stated another way, whether there are so many individual issues that must be resolved that they overwhelm the common questions that bind the litigation. Here, although Defendants recite the existence of numerous supposed individual issues, these issues are, in large measure, superficial or otherwise inconsequential, or otherwise objectively verifiable, and thus incapable of overwhelming the common issues present.

As explained, though the review of undisputed individual facts may be necessary to determine class membership (*i.e.,* whether a particular policyholder was overcharged), it will not be necessary to resolve factual questions for the purpose of determining liability. Indeed, answers to the individualized questions raised by Defendants, such as those concerning the precise location of a policyholder's insured risks, the jurisdictional tax boundaries, the proper tax code, and the tax code applied, are those that are necessary to identify the class, not establish liability, and will be answered with indisputable, objective information. Liability, on the other hand, will turn on subjective determinations regarding Defendants' conduct and the legal claims asserted, which, as explained below, can be established on a class-wide basis.

"To satisfy the predominance requirement in Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a who. . .predominate over those issues that are subject only to individualized proof." *Beattie*, 511 F.3d at 564. Liability in this matter centers upon whether Plaintiffs were charged improper municipal premium taxes in violation of the laws invoked here. This question is at the heart of the claims of all Class Representatives and Class Members and thus predominates over any

individualized questions Defendants claim are necessary to determine liability. *See, e.g.,* *Chesner v. Stewart Title Guar.Co.*, No. 1:06CV000476, 2008 WL 553773, at *11 (N.D. Ohio Jan. 23, 2008) ("[T]he mere fact that questions peculiar to each individual member of the class action remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible") (*citing Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988) (finding predominance where plaintiff alleged that the Public Defender engaged in an ongoing and regular practice of failing to seek indigency hearings for criminal defendants facing incarceration for non-payment of fines)); *Dubin v. Sec. Union Title Ins. Co.*, 162 Ohio App. 3d 97, 103 (Ohio App. 8 Dist. 2005) ("Frequently, numerous consumers are exposed to the same dubious practice by the same seller so that proof of the prevalence of the practice as to one consumer would provide proof for all."); *Mitchell v. Chicago Title Ins. Co.,* No. CT-02-017299, 2003 WL 23786983, at *7 (Minn. Dist. Ct., Dec. 22, 2003) ("The issue of 'predominance' is directed toward the issue of liability.  Thus, as long as the liability issue is common to the class, the common questions will be viewed by this court as predominate over individual questions.").[50]   The same is true for each of the claims Plaintiff proposes for certification.

> ### a.   Defendants' Liability Can Be Established on a Class-Wide Basis.

Defendants raise several of what they believe to be necessary claim-specific individual questions of law.  As demonstrated here, these questions are either wholly inconsequential or

---

[50] Defendant American International's reliance on both *Iliadis v. Wal Mart Stores, Inc.*, 904 A.2d 736 (N.J. Super. 2006) and *Basco v. Wal-Mart Stores*, 216 F.Supp. 2d 592 (E.D. La. 2002) is misplaced. In *Basco*, the Court found that the statistical evidence presented did not remedy the highly individualized nature of each plaintiff's breach of contract and work-off-the clock claims against their employer, which required individual proof as to why an employee may have missed a meal or work break or worked off the clock as well as what the conditions of each employee contract stated.  American International's reliance on *Illadis* is particularly flawed because it was overruled by *Iliadis v. Wal-Mart Stores, Inc*., 191 N.J. 88 (2007).  There, the New Jersey Supreme Court reversed the lower court's denial of class certification and noted that it was confident that the concerns of both parties as to the admissible uses of statistical extrapolation could be properly addressed.  *Id*. at 120.

inappropriate for consideration at this stage of litigation and thus do not predominate over the many common issues which make this class action suitable for certification under Rule 23(b)(3).

## (1) Illegal Dealings in Premiums

Interestingly, although Defendants are insistent in arguing (and Plaintiffs' do not dispute) that merits determinations are not to be made at this stage of litigation, their challenges to the predominance of common issues relating to the Illegal Dealings in Premium cause of action are premised solely on merits-based legal questions.[51]

In particular, Defendants argue that in order to succeed in an Illegal Dealings in Premiums claim, each individual Plaintiff must show that Defendants' conduct was "willful," and that therefore common issues will not predominate. However, Defendants, Plaintiffs and this Court alike are well-aware that the meaning of "willful" under the statute is currently at issue before this Court in *Hassan v. Progressive Casualty,* No. 2:07-CV-00139-DLB (E.D. Ky., Covington Div.). There, plaintiff has taken the position that an insurer's acknowledgement of its imperative duty to identify where the risk is located and the undisputed overcharges that occur are sufficient to establish that the insurer willfully violated its duty to properly assess local government premium taxes and collect only what is owed. Progressive Casualty, on the other hand, argues that only an intentional violation of the known legal duty would violate the Illegal Dealings in Premium statute.

Though which interpretation is correct is a question common to all Plaintiffs and Class Members, it is certainly not a matter for this Court to determine at this time. Indeed, "the correct

---

[51] Plaintiffs allege that Defendants have violated 304.12-190 of the Kentucky Insurance Code, which prohibits insurers from "willfully collect[ing] as premium or charge for insurance any sum in excess of the amount actually expended or in due course to be expended for insurance applicable to the subject on account of which the premium was collected or charged." KRS 304.12-190(2).

interpretation [of a statute] is a matter for determination on the merits, not a motion for class certification." *Chesner*, 2008 WL 553773, at *11. As such, Defendants' argument that individualized issues as to "willfulness" will predominate, must be rejected at this time.

The remaining question relevant in establishing an Illegal Dealing in Premium statutory claim – whether municipal premium taxes and collection fees constitute a "premium" under the statute – is also a legal question common to and determinative for all Class Members. Because both inquiries concerning this cause of action can be established on a class-wide basis, common issues predominate.

### (2) Conversion

In Kentucky, "the tort of conversion is defined as the wrongful exercise of dominion and control over the property of another." *State Auto Mut. Ins. Co. v. Chrysler Credit Corp.*, 792 S.W. 2d 626, 627 (Ky. App. 1990). Specifically, a claim for conversion requires proof that: (1) plaintiff has legal title to the converted property; (2) plaintiff had possession of the property or the right to possess it at the time of the conversion; (3) the defendant exercised dominion over the property which denied the plaintiff's rights to use and enjoy the property and which was to the defendant's own use and beneficial enjoyment; (4) the defendant intended to interfere with plaintiff's possession; (5) the plaintiff made some demand for the property's return which the defendant refused; (6) the defendant's act was the legal cause of the plaintiff's loss of the property; and (7) the plaintiff suffered damage by the loss of the property. *Ky. Ass'n of Counties All Lines Fund Trust v. McClendon*, 157 S.W. 3d 626, 632 n. 12 (Ky. 2005) (quoting 90 C.J.S. Trover and Conversion §4 (2004)).

Defendants contend that certification of the conversion cause of action is inappropriate as it demands individualized proof of intent. The law, however, is to the contrary. It has long been

47

recognized in Kentucky that "a wrongful intent is not an essential element of the conversion" and that "the purchaser of stolen chattels acquires no title, however innocent he may be, and an innocent holder appropriating or disposing of stolen property is liable for conversion." *Urban v. Lansing's Adm'r*, 239 Ky. 218, 221 (1931); *State Auto.*, 792 S.W.2d at 627 (noting as "well-known" the fact that "neither motive, intent nor good faith is material" to a conversion action). Plaintiffs and Class Members need not prove individually that Defendant wrongfully converted the premium taxes and collection fees at issue here. *See, e.g., Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017 (6th Cir. 1979) *superseded by statute on other grounds,* 116 F. Supp. 2d 917 (N.D. Ohio 2000) ("This may not be a garden variety conversion case in which the malefactor has wrongfully pocketed the property of the plaintiff but that is not necessary for a common law conversion claim.  All that is necessary is that the defendant exercise dominion and control over the property which is inconsistent with the plaintiff's rights).  Plaintiffs' conversion cause of action is thus suitable for class certification.  To the extent this issue is in dispute, it is a predominant, common issue that can be resolved by a motion for summary judgment.

Defendants State Farm, Travelers Property and Standard Fire argue that the conversion claims will also require individual proof as to whether any class member demanded a return of their property.  This Court previously explained, however, that where a conversion has occurred by way of a wrongful taking at the outset, demand and refusal need not be proved.  *See* Memorandum Opinion and Order, Document 131 (March 31, 2007) (*relying on Joseph Goldberg Iron Co. v. Cincinnati Iron & Steel Co.*, 154 S.W. 374 (Ky. 1913)).  Because Plaintiffs here assert that the monies were paid under qualifying circumstances, individualized proof of demand and refusal will not be necessary.  Needless to say, whether demand will be required to sustain Plaintiffs' conversion cause of action is not a question appropriate for consideration at this time.

*See* Order at 25-26. ("The extent to which demand and refusal may ultimately be in issue and the required proof necessary…is for later consideration on the merits of the claim.").

(3) <u>Negligent Servicing</u>

In Kentucky, actionable negligence consists of "a duty on the defendant, a breach of the duty, and a causal connection between the breach of the duty and an injury suffered by the plaintiff."  *Lewis v. B&R Corporation*, 56 S.W. 3d 432, 436-437 (Ky. App. Ct. 2001).  Each of these elements can unquestionably be resolved on a class-wide basis.

First, whether each Defendant owed the Plaintiffs and Class Members a duty to use the best methodologies available to verify the accuracy of their tax assignments and ensure that the proper tax is charged is a legal question that if determined for one Plaintiff, is determined for the entire Class.

Next, each Defendant's breach of this duty can be demonstrated with class-wide proof.  Indeed, as discussed above, *supra* 25-26, the record already shows that many Defendants have breached their duty to ensure accuracy by failing to implement and institutionalize verification methodologies such as geo-coding.

The causation element, which is the crux of each Defendant's challenge, can be inferred by the fact that an overpayment has occurred and that the occurrence of that overpayment was identified with the use of geo-coding. Whether, as Defendants contend, there are individual reasons for such overpayments that are unrelated to a Defendant's failure to verify the accuracy of tax assignments is irrelevant for certification purposes.  Rather, any unique reason for the improper charge that a Defendant may choose to assert would be relevant only as a potential defense to liability, and if enough class members are vulnerable to this defense, the issue can be

49

managed by the creation of a subclass.  As shown below, the existence of such defenses does not defeat satisfaction of Rule 23(b)(3).

Finally, whether an injury has occurred does not require any individualized proof, since injury is established *per se* upon recognition that Plaintiffs and Class Members have paid improperly charged municipal taxes and collection fees.

### (4) Declaration of Rights

Finally, Plaintiffs seek a declaratory judgment stating that, pursuant to KRS 91A.080(4), Defendants cannot charge collection fees in addition to a municipal premium tax.  Plaintiffs also insist that Defendants disgorge any benefits received from having collected such fees from the Members of the Classes.[52]  The core question inherent in this claim is whether KRS 91A.080(4) makes it unlawful for Defendants to add a collection fee on top of the municipal premium local tax.  This merits-based legal question clearly predominates, and in fact, no Defendant has elected to argue otherwise.  Indeed, when the question is appropriately litigated at the merits-stage, its answer will be applied uniformly to all Plaintiffs and Class Members without the need to delve into any individual inquiries.

### b.    Individual Issues as to Causation and Related Defenses Will Not Predominate.

Some of the Defendants argue that the causation requirements inherent in Plaintiffs' negligence and conversion claims necessarily involve innumerable individual inquiries which defeat the predominance of common issues.  As noted above, this is not true: causation here can

---

[52] The provision upon which Plaintiffs rely for this cause of action is KRS 91A.080(4), which provides that: The Office of Insurance shall, by administrative regulation, provide for a reasonable collection fee to be retained by the insurance company or its agent as compensation for collecting the tax, except that the collection fee shall not be more than fifteen percent (15%) of the fee or tax collected and remitted…or two percent (2%) of the premiums subject to the tax, which is less.

be readily established on a class-wide basis with common and generalized proof.  Specifically, once the classes of persons who have paid taxes and collection fees that were not owed to Defendants are established, Plaintiffs will readily be able to determine whether that improper change was caused by Defendants' failure to institutionalize a sufficient system for verifying the accuracy of municipal premium tax assignments (for the negligence claim), and whether the Defendants thereby exercised dominion over Plaintiffs' monies (for the conversion claim).  Accordingly, individual and complex causation inquiries such as those involved in personal injury or property rights cases will not be necessary at the liability stage.

Defendants' primary challenge to causation seems to be comparative negligence flowing from alleged errors made by individual plaintiffs in representing the location of their insured property.  These are affirmative defenses which are relevant only for damage determinations and do not preclude class certification.  *Coffin v. Bowater, Inc*., 228 F.R.D. 397, 406 (D. Me. 2005) ("In the event that Plaintiffs establish [Defendant's] liability . . .[Defendant] will still have a full and fair opportunity to raise any affirmative defenses . . . at the time damages are calculated.").  Indeed, "the question for purposes of determining predominance is not whether a defense exists, but whether the common issues will predominate over the individual questions raised by the defense."  *In re Visa Check/ MasterMoney Anti. Litig.*, 280 F.3d 124, 138 (2d Cir. 2001) *superseded by statute on other grounds,* 238 F.R.D. 82 (S.D.N.Y. 2006); *see also Beattie*, 511 F.3d at 564 ("the fact that a defense 'may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones'") (*quoting Waste Mgmt. Holdings, Inc., v. Mowbray,* 208 F.3d 288, 296 (1st Cir. 2000)); *Bittinger v. Tecumseh Prods Co*., 123 F.3d 877, 884 (6th Cir. 1997) (finding that defendants' argument that the district court should not have certified the class because some of the plaintiffs' claims

51

would be subject to varied defenses that would release defendant from liability was not sufficient to justify rejection of class certification).[53]

Individual defenses have been found not to overwhelm common issues or impair class certification both in cases where defendants' alleged defenses might be applicable to a large number of class members, *Mitchell-Tracey*, 237 F.R.D. at 557 (". . . there may be defenses that apply variously to individual plaintiffs.  However, the existence of an affirmative defense does not destroy commonality or typicality necessarily, because it is more likely than not that the defenses will be asserted against all or a large number of plaintiffs"); *Randleman,* 2008 WL 2323771, at *18 (same); *Collins v. Olin Corp*., 248 F.R.D. 95, 105 (D.Conn. 2008) (". . . courts have been reluctant to deny class action status because affirmative defenses might be available against different class members as long as the defenses do not overshadow the primary claims."), or to a relatively small group of individuals.  *Smilow v. Southwestern Bell Mobile Sys., Inc*., 323 F.3d 32, 39-40 (1st Cir. 2003) (if "evidence later shows that an affirmative defense is likely to bar claims against at least some class members, then a court has available adequate procedural mechanisms. For example, it can place class members with potentially barred claims in a separate subclass, . . . or exclude them all together") (internal citations omitted); *see also Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 484 (E.D.N.Y. 2001) ("If, at a later point in the litigation, the Court finds that a collective action cannot accommodate the proposed individual defenses, the Court has the discretion to create subclasses or to dismantle the collective action.");

---

[53] *See also In re Visa Check/ Mastercard Anti. Litig*., 280 F.3d at 141 ("There are a number of management tools available to a district court to address any individualized damages issues that might arise in a class action, including: (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class.").

*see also Bittinger*, 123 F.3d at 884 ("It may be that the best remedy to both the purportedly atypical claims and defenses would be to create sub-classes.").

**2.     The Instant Class Action is the Superior Form of Adjudicating the Claims of Plaintiffs and Class Members.**

Given the uniformity of Plaintiffs' legal claims and factual allegations, the superiority of utilizing the class action device to resolve this controversy is unquestionable.  As recognized by the comparable line of title insurance class actions:

> This is precisely the kind of case that class actions were designed for, with small or statutory damages brought by impecunious plaintiffs who allege similar mistreatment by a comparatively powerful defendant, one that, if the fact allege[d] were proved, otherwise might get away with <u>piecemeal highway robbery</u> by committing small violations that were not worth the time and effort of individual plaintiffs to redress or were beyond their ability or resources to remedy.

*Cohen v. Chi. Title Ins. Co.*, 242 F.R.D. at 300 (*citing Van Jackson v. Check 'N Go of Illinois, Inc.,* 193 F.R.D. 544, 547 (N.D. Ill. 2000)) (emphasis added).[54]

Defendants' promotion of alternative avenues of adjudication is strikingly unpersuasive. In particular, there is no evidence that seeking remedy individually through the complex and lengthy administrative process or by contacting Defendant and requesting a refund would offer a more fair or efficient adjudication of the present controversy.  Moreover, for the reasons asserted in the opening memorandum[55] and as more fully discussed above, this class action is manageable.

---

[54] *See also Mitchell v. Chicago Title,* 2003 WL 23786983, at *8:
> Where, as here, a large number of class members share a single grievance that is redressible through a one-time presentation of evidence, the class action certification mechanism is an efficient and cost-effective method of adjudicating the rights of aggrieved persons. The alternative- each member starting its own lawsuit- would not be preferred, and individual class members are unlikely to bring lawsuits over such relatively small amounts of money.  Class action cases are in part encouraged in order to make plaintiffs whole even though they have a small financial stake in the outcome of a case, as well as encouraged for their law enforcement powers.

[55] Pltfs. Memo., at 21-26.

a.     **Plaintiffs Are Not Required to Exhaust Administrative Remedies, and Administrative Remedies Would Not Adequately Address Plaintiffs' Claims.**

Nearly each Defendant argues that since an administrative remedy exists under § 304.2-165, the proposed class action is not superior to adjudicating plaintiffs' claims under KRS § 304.12-190.  Indeed, this court previously found that an administrative remedy is not mandatory in this case, holding that "Plaintiff's cause of action is neither preempted nor precluded by KRS § 304.2-165" and that "KRS § 304.2-165 is but *a* vehicle for lodging some form of dissatisfaction with an insurer, rather than *the* vehicle."  Motion to Dismiss Order at 14 (emphasis in original).  Although a recent amendment to Chapter 91A makes use of this administrative remedy mandatory, the statute expressly excludes pending litigation from its scope. KRS § 91A.0804 (1).[56]

Acknowledging its inapplicability here, Defendants nonetheless advise this Court to consider Section 304.2-165's exhaustion requirement in its superiority analysis.[57]  However, the law is clear that an exhaustion requirement should be excepted where the administrative remedy is inadequate, where pursuit of administrative remedies would be futile, where irreparable injury will result unless immediate judicial review is permitted, or where the administrative proceeding would be void.  *I.A.M. Nat'l Pension Fund, Ben. Plan C, v. Schulze Tool and Die Co., Inc.*, 564

---

[56] "The provisions of his subsection shall not apply to any refund or credit to an insurance company or policyholder or assessment by a local government that is affected by litigation pending on July 15, 2008."  KRS § 91A.0804 (1).

[57] It should be noted that absent a legislative mandate, courts need not mechanistically impose an exhaustion requirement as a prerequisite for obtaining class certification; application of the doctrine is in the "sound discretion of the court."  *I.A.M. National Pension Fund v. Schulze Tool and Die Co., Inc.*, 564 F. Supp. 1285, 1291 (7th Cir. 1983) ( "[t]he requirement of exhaustion is generally not absolute, unless the legislature so mandates, but must be applied in each case with an understanding of its purposes and the particular administrative scheme involved…if exhaustion is not a statutory condition of jurisdiction…then application of the doctrine is in the sound discretion of the court"); *Slapikas v. First American Title Insurance Co.*, 2008 WL 793919 (W.D. Pa. March 24, 2008) (noting that "plaintiffs are not required to exhaust administrative remedies before bringing this action").  Indeed, Defendants' own case, *Patillo v. Schlesinger*, states that "[e]xhaustion of administrative remedies is not an absolute requirement under all circumstances, and there exist instances in which 'the particularities' of a concrete set of facts will justify relaxation of an otherwise applicable exhaustion requirement." 625 F.2d at 266.

F. Supp. 1285, 1290-91 (7th Cir. 1983).   The administrative remedy in this case is likely

inadequate, as Class Members are unlikely to take advantage of the available administrative

processes, since individual damages are relatively low in proportion to the high burden of

administrative adjudication.  *See In re Coordinated Title Ins. Cases*, 784 N.Y.S. 2d at *17

(emphasizing that "[a]dministrative alternatives are also not superior to a class action in the

instant matter. . .despite the heavy regulation of the insurance industry, including investigative

and enforcement powers, there is a low likelihood that the full number of potential claimants will

step forward to press an administrative proceeding"); *Kurihara v. Best Buy Co., Inc.*, No. C06-

01884, 2007 WL 2501698, at *11 (N.D. Cal. Aug. 30, 2007) ("The availability of administrative

hearings for the relatively small amounts at issue on behalf of each individual class member does

not dissuade this court from determining that a class action is superior overall to other forms of

relief ").   Consolidation of all of Plaintiffs' claims into a class action suit removes any

motivational barriers that may preclude individual members from advancing their own claims on

their own time and dollar and will thus allow plaintiffs access to an otherwise inaccessible

remedy.

     Notably, requiring administrative resolution in this case would defeat the underlying goal

of the exhaustion doctrine, which is "the expeditious administration of justice." *I.A.M.,* 564 F.

Supp. at 1294, *quoting Montgomery v. Rumsfeld*, 572 F.2d 250, 253 (9th Cir. 1978).  If

individual claimants were all to bring their claims separately, the state agency would be as

overwhelmed by individual hearings as the courts would be in similar circumstances.  Thus, the

requirement of efficiency points towards class action as a superior method for dealing with these

claims, since "[w]hether dealing with the resources of an administrative agency or the judiciary,

prosecuting a large amount of claims individually instead of deciding the matter of liability once is simply not efficient." *In re Coordinated Title Ins. Cases*, 784 N.Y.S. 2d at *17.

The cases Defendants cite in favor of the superiority of the administrative remedy are distinguishable from the case at hand. For instance, in *Patillo v. Schlesinger*, 625 F.2d 262, 266 (9th Cir. 1980), the disputed issue was not whether plaintiffs were entitled to damages, but what method of payment was most appropriate; a matter that the court held was best resolved via administrative procedures. *Id.* at 265.  However, entitlement is a contested issue in this case, and plaintiffs seek a verdict on the merits as to their right to collect damages from the Defendants. The court in *Bridgestone* ruled that a class action suit was not an appropriate method for resolving a claim brought by plaintiffs who had purchased faulty Bridgestone/ Firestone tires, since the class was composed of individuals who suffered no actual harm.  Litigation by those who suffered actual injuries caused by the faulty tires, along with regulation by the NHTSA, was deemed superior to a suit brought by a class of uninjured buyers. *In the Matter of: Bridgestone/ Firestone, Inc.*, 288 F.3d 1012, 1019 (7th Cir. 2002).  Here, however, the class of plaintiffs seeking certification alleges actual damages as a result of Defendants' actions.

In *Ostrof v. State Farm Mut. Auto. Ins. Co.*, 200 F.R.D. 521 (D. Md. 2001), the court was asked to evaluate claims relating solely to the internal operations of an insurance company, which the court held would be better resolved by an agency with specialized knowledge of the insurance industry. *Id.* at 532.  Here, evidence of Defendant's misconduct may be objectively ascertained without specialized industry knowledge; as explained, geo-coding software and any manual review of the insured's' files will identify those who were charged improper municipal taxes and fees.  Because the court will have access to an evidentiary record that is as complete and accurate as that available to the administrative agency, special expertise regarding the

insurance industry will not be necessary for the resolution of Plaintiffs' claims; the court will be well equipped to render a verdict on the merits.

### b.  Alternative Methods of Addressing Plaintiff's Injuries Do Not Offer the Efficiencies, or the Security, of Class Treatment

Defendants Ohio Casualty. West American, Travelers Property, and Standard Fire also posit that the putative class members' claims could also, and more easily, be addressed through a second alternative means of resolution:  simply allowing the policy holder to call their respective insurance companies seeking a refund.[58]  Aside from not addressing how such putative Class Members would become aware of the fact that they have been over-charged, these Defendants' suggestion leaves numerous other questions unanswered.[59]

For example, what type of inquiry by the injured party would be sufficient to trigger a refund?  What type of confirmatory inquiry would the company have to make, if any, to validate the customer inquiry – and what types of information would the company rely upon?  Which party would be responsible for calculating the amount of refund due, and what components would be included?  What would the policy holder do if he or she disagreed with the calculation

---

[58] Left unsaid is a third option:  remaining Defendants, like others before them, could simply analyze their policyholder data, identify the affected class members, and make appropriate arrangements to return the money that should never have been collected in the first instance.  By doing so, State Farm would be the "good neighbor" it claims to be; Nationwide would truly be "on [the] side" of the policy holders it has insured.  Progressive customers would be able to worry less about "saving hundreds" on their car insurance, since they would be getting more of their own money back, and American International would truly demonstrate "the strength to be there" for its customers.  Needless to say, these Defendants have chosen to overlook this option for resolving the claims of putative class members, presumably because it virtually mirrors the class certification sought herein.

[59] Defendants Travelers Property and Standard Fire cite *In re PPA Products*, 214 F.R.D. 614 (W.D. Wash. 2003) to highlight the superiority of using an "in-house method of efficiently responding to and redressing class members' claims." *See* Travelers Casualty and Standard Fire Memo. at 28-29.  That case is factually distinguishable, rendering its value inconsequential.  There, defendants had in place a special refund and product replacement program for the specific purpose of providing redress to persons, including plaintiffs, who had PPA-containing products.  Even more notable is the fact that there, the defendants engaged in a great deal of effort to publicize their refund program.  The court noted that the defendants' publicity was so effective that several thousands of affected purchasers had already contacted defendants to obtain their refund or replacement. *Id*. at 622.  Here, these Defendants cannot possibly contend that their proposal to answer complaints on an individual, *ad hoc* basis is comparable to the program effectuated in *In re PPA*.  Not only do these Defendants not have any such refund program, they also have not made *any* effort or proposed any effort to inform their policyholders that they may be entitled to a refund.

– would there be any additional process due to the policy holder?  Assuming, *arguendo*, that the company issued a refund, would that refund operate as an accord and satisfaction?

The irony in the questions left unanswered by Ohio Casualty's and West American's proposal, is that each of those questions are squarely and soundly addressed by certifying the current action as a class action.  The class action mechanism will, ultimately, lead to the identification of the affected policy-holders, provide an opportunity for them to assert their claims (with individual details, as needed), and to obtain the guidance and protection of counsel and the Court's process.  In addition, any judgment ultimately rendered in favor of those class members, will have a preclusive effect against claims by those class members against the respective defendant, or *vice versa*, thereby giving both parties the benefit of finality attendant only to contested (and resolved) litigation.

For those reasons, the class action mechanism is clearly the superior method of resolving the claims asserted by the Plaintiffs herein.  In fact, class certification is likely the only method by which the claims of the putative class members will ever be remedied.

## III.    CONCLUSION

For the reasons set forth herein and in their original memorandum in support, Plaintiffs respectfully request that their Motion for Class Certification of the Classes as defined be granted.

DATED: September 12, 2008          Respectfully submitted,

/s/  Gary E. Mason
Gary E. Mason, Esquire (*Pro Hac Vice*)
THE MASON LAW FIRM, L.L.P.
1225 19th Street NW, Suite 500
Washington, D.C. 20036
P: (202) 429-2290 F: (202) 429-2294

Alexander F. Edmondson, Esquire
Jason V. Reed, Esquire (87513)
EDMONDSON & ASSOCIATES
28 West Fifth Street
Covington, KY 41011
P: (859) 491-5551 F: (859) 491-0187

Christopher S. Nordloh, Esquire (85716)
NORDLOH LAW OFFICE, PLLC
28 West Fifth Street
Covington, KY 41011
P: (859) 491-9991 F: (859) 491-0187

John C. Whitfield, Esquire
WHITFIELD & COX, PSC
29 East Center Street
Madisonville, KY 42431
P: (270) 821-0656 F: (270) 825-1163

Counsel for Plaintiffs

<u>CERTIFICATE OF SERVICE</u>

This will certify that the foregoing was filed with the Clerk of the U.S. District Court, Eastern District of Kentucky, on September 12, 2008, thereby generating electronic service and notice of service to all counsel of record.

/s/  Gary E. Mason
Counsel for Plaintiffs